COMPOSITE MARINE PROPELLERS,
INC., Plaintiff–Appellee, Cross–
Appellant,

v.

Gerbrig VAN DER WOUDE, et
al., Defendants–Appellants,
Cross–Appellees.

Nos. 91–1724, 91–1813.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1991.

Decided May 4, 1992.

Rehearing and Rehearing En Banc
Denied May 28, 1992.

Douglas R. Dalgleish (argued), Daniel M. Dibble, Thomas S. Stewart, Lathrop, Norquist & Miller, Kansas City, Mo., John L. Vratil, William G. Howard, Lathrop, Koontz & Norquist, Overland Park, Kan., for plaintiff-appellee.

John V. Patton, Bozeman, Neighbour, Patton & Noe, Moline, Ill., Keith V. Rockey (argued), Rockey & Rifkin, Chicago, Ill., for defendants-appellants Gerbrig Van Der Woude, Charles H. Whitmore, Vanderwoude Plastics Corporations, Advanced Plastics Partnership, Advanced Plastics Technology, Ltd., T.S. Moore & Associates, Inc. and Paul F. Lancour.

Before EASTERBROOK, RIPPLE, and KANNE, Circuit Judges.

PER CURIAM.

Composite Marine Propellers, Inc. (CMP) designed and sold marine propellers made of a metal-plastic composite. Injection Structural Plastics, Ltd. (ISPL) was its principal supplier. ISPL signed a contract promising not to compete with CMP and to refrain from using CMP's trade secrets, and to obtain similar pledges from its employees. ISPL did not, however, obtain no-competition promises from its workers, and CMP did not check to see what steps ISPL had taken to protect its intellectual property.

Several of ISPL's key employees quit and set up their own corporation, which began to make marine propellers out of plastic, without the metal hubs of CMP's propellers. Gerbrig Van Der Woude obtained a patent covering an all-plastic propeller. CMP has not challenged in this litigation the validity of this patent, and Van Der Woude has filed a separate suit charging CMP with infringement. Nonetheless, CMP contends in this diversity litigation that defendants are using its trade secrets in making and selling the patented propeller—and that even if they are not, they should be barred from competition because of the CMP–ISPL contract. CMP also argued that ISPL's employees were bound by common law principles of fiduciary duty and unfair competition not to become its business rivals.

The district judge granted judgment to the defendants on CMP's claims based on express and implied contract. A jury returned a verdict in CMP's favor and awarded compensatory damages of $98,000 plus a total of $225,000 in punitive damages on the remaining claims. The district court granted judgment notwithstanding the verdict to Paul F. Lancour on the punitive damages question but entered judgment on the remainder of the verdict. Everyone appeals.

## I

The district court dismissed all claims based on the CMP–ISPL contract because ISPL is not a party. ISPL is the only entity in a contractual relation with CMP. The duties of the defendants ran to ISPL (their employer) and not to CMP. Illinois, whose law governs this case, respects the corporate form. *Sea–Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir.1991) (discussing Illinois law). CMP and Cray well knew that they were dealing with ISPL and not with its owners or employees. Corporate obligations do not attach to a firm's investors or employees.

Claims based on unfair competition and breach of fiduciary duty stand or fall with those based on contract. Like other states Illinois allows competition between a departing employee and his former employer in the absence of a contractual promise to refrain from such competition. *Radiac Abrasives, Inc. v. Diamond Technology, Inc.*, 177 Ill.App.3d 628, 636–37, 126 Ill.Dec. 743, 748, 532 N.E.2d 428, 433 (2d Dist. 1988). A person free to compete against his ex-master may compete against the master's customers too. None of the defendants promised to refrain from competition with either ISPL or CMP. "Fiduciary duty" adds nothing, because there is no basis for such a duty other than the contract. ISPL may be liable to CMP for inadequate diligence in protecting CMP's interests, and may have remedies against the departing employees, but ISPL is not a party. CMP essentially wanted the district court to pierce ISPL's corporate form and treat its obligations as running directly from ISPL's employees to CMP. The district court properly rejected that request, for reasons with which we agree (and on which we therefore do not elaborate further).

One ground other than the CMP–ISPL contract might supply a footing for unfair competition and fiduciary duty claims: defendants' use of CMP's secret information. Yet Illinois has abolished all common law theories of misuse of such information. Ill. Rev.Stat. ch. 140 ¶ 358(a). Unless defendants misappropriated a (statutory) trade secret, they did no legal wrong. We therefore turn to CMP's claim under the statute.

## II

The district judge submitted to the jury eight possible trade secrets that the defendants might have appropriated. The jury returned a general verdict, so if the evidence supports any one of them, the verdict must be sustained. Cf. *Griffin v. United States*, — U.S. —, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). We take the evidence together with all reasonable inferences in the light most favorable to CMP. Indeed, we shall take the evidence according to the testimony of Thomas Cray, CMP's founder and guiding light. Despite giving CMP the benefit of all inferences, we conclude that the evidence does not establish that defendants used any of CMP's trade secrets.

Briefly, the eight pieces of information that CMP contends are secret, and appropriated by the defendants, are: (1) propeller blade flex; (2) marketing plans and strategies; (3) gas counter backpressure in molding; (4) water line configuration in the molds; (5) hub cooling methods in molding; (6) secondary sprue trimming; (7) material characteristics; (8) test data. Nothing turns on whether we call these "trade secrets" or, as CMP prefers, "trade secret, proprietary or confidential information." For simplicity we use "trade secret." No matter what the name, CMP must establish that these pieces of information were (i) secret (that is, not generally known in the industry), (ii) misappropriated

(that is, stolen from it rather than developed independently or obtained from a third source), and (iii) used in the defendants' business. Ill.Rev.Stat. ch. 140 ¶ 352(d) (Uniform Trade Secrets Act definition of trade secret); *American Antenna Corp. v. Amperex Electronic Corp.*, 190 Ill.App.3d 535, 538, 137 Ill.Dec.. 417, 420, 546 N.E.2d 41, 44 (2d Dist.1989) (defining misappropriation); *Service Centers of Chicago, Inc. v. Minogue*, 180 Ill.App.3d 447, 453, 129 Ill.Dec. 367, 371, 535 N.E.2d 1132, 1136 (1st Dist.1989) (defining secrecy). It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets. *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir.1987) (Illinois law).

Specificity is especially important when a defendant holds a patent on the product, as Van Der Woude does for the all-plastic propeller. It would substantially diminish the scope of patent protection to allow an award of damages for making and selling a product on which you have a patent, just because of vague overlaps between the patented product and another firm's technology. As we shall see, CMP's claims are of an exceedingly general sort. We take them one by one.

■ 1. **Propeller blade flex:** The efficiency with which a propeller translates energy from rotation to propulsion depends in part on the degree to which it bends under pressure. CMP was originally called Flextech because the designer of its propeller believed that additional flex was beneficial. Cray undertook research and discovered that the old blades not only did not bend the amount they were supposed to do, but also that the design called for too much flex, which CMP reduced. Cray testified that the optimal degree of flex, discovered by dint of this research, is CMP's trade secret. The jury was entitled to credit Cray's submission that the flex of a CMP propeller is a valuable secret of CMP. We could not find in the record, however, any evidence that defendants used this knowledge. It is undisputed that the patented Van Der Woude propeller (which defendants market as the "Phantom") uses a flex that differs from CMP's products.

CMP could have replied (a) that defendants learned from CMP's experiments just which differences would be improvements, or (b) that the differences in flex between the propellers were not important—for example, that the optimal flex is some number plus or minus a tolerance, and that defendants' products fall within that tolerance. CMP's brief does not make either of these claims. Although CMP says that the Phantom propeller was "similarly designed to have a very low degree of flex", CMP does not specify the optimal flex, identify a range that the trade secret occupies, or show that the Phantom comes within such a range. Our independent review of the record did not turn up any evidence for proposition (a) or (b). We therefore hold that although the record supports a conclusion that the flex of CMP's product is CMP's trade secret, it does not permit a conclusion that defendants used this information in making their Phantom propeller.

■ 2. **Marketing plans and strategies:** CMP contended that its marketing channels, plus its choice of a line of products, are confidential business information. Both CMP's brief in this court and Cray's testimony at trial are vague about the nature of these secrets. Cray does not accuse defendants of making off with customer lists, the usual focus of claims of this flavor. Instead Cray concentrated on CMP's decisions about appropriate products to make. Surely, however, CMP cannot mean that the idea of making marine propellers and selling them through the usual channels in the boating industry is its trade secret. Cray testified that he told "50 or 60 sales reps throughout the country" about his marketing channels. These persons sold products in addition to CMP's, owed it no allegiance, and did not promise confidentiality. CMP therefore has not established the existence of trade secrets. It has not accused defendants of resorting to an unusual business strategy or means of distribution that they must have learned from it. If CMP has any other theory, it has neglected to inform us (or the jury) about its nature.

■ **3. Gas counter backpressure in molding:** Both CMP and defendants make propellers by injection molding. CMP's original products had an undesirable appearance. During a visit to Highline Plastics in Olathe, Kansas, Cray learned about "gas counter backpressure," a method of injecting an inert gas into the mold before injecting the plastic. The pressure of the gas improves the finish of the molded product. Cray adopted gas counter backpressure in the manufacture of CMP's propellers.

Gas counter backpressure, well known among practitioners of injection molding—so commonplace that another firm introduced Cray to the technique without compensation or promise of secrecy—obviously is not a trade secret of CMP. Adaptations that make the technique more useful in forming propellers could be trade secrets. But Cray did not identify any commercially valuable adaptations such as the amount of pressure; the particular gas; or the manner, time, and temperature of its injection. He did not testify that defendants have used any adaptations CMP made. For all the record reveals, defendants are using plain vanilla technology, a staple of the injection molding business. (Van Der Woude is a specialist in injection molding.) Indeed, Cray did not testify that defendants use gas counter backpressure at all and professed ignorance about their manufacturing techniques. Nothing in this record supports a conclusion that CMP had, let alone that defendants misappropriated and used, any trade secret concerning gas counter backpressure.

■ **4. Water line configuration in molding:** Van Der Woude and Lancour suggested to Cray some changes in the arrangement of water lines used to cool the metal molds. Cray contends that these changes, which CMP adopted, are CMP's trade secrets, which the defendants have misappropriated. Charging defendants with misappropriating their own innovation is not as strange as it may appear at first. If they sold the technology to CMP—or were obliged to hand it over as CMP's fiduciaries—then CMP acquired a property interest in using the information to the exclusion of the innovators. For reasons we have already explained defendants were not CMP's fiduciaries. Perhaps ISPL was under a contractual obligation to CMP to secure this technology for CMP's benefit, but as we have stressed, ISPL has not asserted that Van Der Woude and Lancour broke any promise to limit their own use of their ideas. We conclude, therefore, that defendants' improvements to the placement of the cooling lines are not trade secrets of CMP.

**5. Hub cooling methods in molding:** Our discussion of cooling line placement applies equally to hub cooling methods, which also are improvements developed by Van Der Woude and Lancour.

**6. Secondary sprue trimming:** As a molding specialist, Van Der Woude had not exhausted his bag of tricks by proposing cooling methods. He suggested to Cray a method of trimming the plastic in the sprue to produce a smooth finish on the propeller. (A sprue is the hole or channel through which material enters a mold.) CMP followed Van Der Woude's suggestions and now contends that the defendants are forbidden to use this knowledge themselves. Our discussion of water lines and hub cooling is applicable here as well.

■ **7. Material characteristics:** When CMP bought its initial propeller technology from Lee's R & D, it obtained a formula for a polypropylene plastic with 30% short fiberglass and a chemical coupling agent. CMP has experimented with other materials for its propellers but stuck with the formula from Lee's R & D until after it stopped buying molded propellers from ISPL. The composition of the propeller cannot be deduced from inspection, and the jury would have been entitled to conclude that this composition is a valuable secret of CMP.

Missing is evidence that defendants used the formula. Defendants make the Phantom from a polyurethane plastic, not a polypropylene plastic. They use 60% glass fibers, not 30%. (Information about the composition of the Phantom comes from Van Der Woude, but CMP does not dispute his claim.) Cray did not testify that infor-

mation confidential to CMP pointed toward the material that defendants elected to use. There has been a total failure of proof on this aspect of CMP's claim.

■ 8. **Test data:** CMP tested its products using radar guns and accelerometers, among other things. It generated data on the performance of different designs. A jury would have been entitled to conclude that the data are valuable secrets of CMP. This time the missing element is evidence showing that defendants had access to these data in anything other than the most summary form, or used the data in any way. Cray testified that he did not provide raw data to any of the defendants, and he was unable to link any of the defendants' design choices to the summaries of the data he provided orally to Van Der Woude and Lancour.

None of the evidence, individually or together, supports a reasoned conclusion that defendants misappropriated and used any of CMP's trade secrets. The verdict must be set aside for want of evidentiary support.

Whenever a jury returns a verdict apparently unsupported by the evidence, a court should ask itself: who is mistaken, the jurors or the judge? Our review of the transcript suggests that this jury may have been influenced by the CMP–ISPL contract more than by the feeble claims of "trade secrets." Despite granting summary judgment to the defendants on CMP's claims under the contract with ISPL, the district judge admitted the contract into evidence, and plaintiffs hammered away on an unfair competition theme. The punitive damages are based expressly on the claim of unfair competition. As most competition is "unfair" in lay terms, an award becomes more understandable. Competition is ruthless, unprincipled, uncharitable, unforgiving— and a boon to society, Adam Smith reminds us, precisely because of these qualities that make it a bane to other producers. This verdict may well reflect jurors' dissatisfaction with defendants' disloyalty rather than a belief that they stole valuable intellectual property. It may well be that the jurors imputed ISPL's promises to defendants and held them liable without the sort of regard for the corporate form that it takes a legal

education to imbue. Whatever the defendants' moral shortcomings in taking advantage of ISPL's neglect to obtain no-competition agreements, they did not commit the sin (misappropriation of trade secrets) on which this award stands or falls. The judgment in CMP's favor is reversed.

### III

■ One final issue. The district court ordered defendants to pay the legal expenses CMP incurred in responding to an untimely motion for summary judgment. Defendants say that this award is an abuse of discretion because (a) the district court granted them most of the relief sought in the motion, and a successful motion cannot be sanctionable; and (b) the deadline for motions was set by the first court in which the case was filed (the District of Kansas) and lost force when the suit was transferred to Illinois. Neither argument is sufficient, given the deferential standard of review. See *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399–405, 110 S.Ct. 2447, 2457–61, 110 L.Ed.2d 359 (1990); *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928 (7th Cir.1989) (in banc). The Kansas court was entitled to set deadlines before the transfer, and if dissatisfied with these deadlines defendants should have asked the judge in Illinois to change them. Deadlines must have teeth. A judge would have been free to disregard defendants' motion as untimely; he has the lesser power to impose a mild sanction.

The award of sanctions is affirmed. The judgment on the merits in favor of CMP is reversed.

RIPPLE, Circuit Judge, concurring.

I join the judgment of the court. Reversal of a jury verdict by an appellate court on the ground that the record contains insufficient evidence is indeed a rare judicial event and one that ought to be taken only after the most careful inspection of the record. See *Arcor, Inc. v. Textron, Inc.*, 960 F.2d 710 (7th Cir.1992); *Cygnar v. City of Chicago*, 865 F.2d 827, 834 (7th Cir.1989) ("the drastic step of overturning a jury's verdict"). Nevertheless, in this case, an inspection of the record yields no ground that supports the contention that the defendants used the trade secrets or

other proprietary or confidential information of the plaintiff in their business.

While the law of Illinois is admittedly underdeveloped on this point, I am a great deal less confident than my brothers that Illinois would limit the scope of its unfair trade practices or breach of fiduciary duty torts to the corporate entities which signed the contract. *See Lecrone v. Leckrone,* 220 Ill.App.3d 372, 162 Ill.Dec. 814, 819, 580 N.E.2d 1233, 1238 (1991). The contract not to compete and not to divulge trade secrets is between CMP and ISPL. However, ISPL was a small organization. The evidence makes clear that Mr. Whitmore, one of the defendants, signed the contract on behalf of ISPL and, as president of ISPL, surely had sufficient responsibility for compliance with the contract to permit a jury to expect he would secure the contemplated agreement of ISPL's employees. A reasonable jury could also conclude that Mr. Van Der Woude, another defendant, had sufficient responsibility in ISPL to make him aware that the essence of CMP's expectation was that neither he nor Mr. Whitmore would use to their own advantage the information procured from CMP while working on its project. There was also significant testimonial evidence from Mr. Cray, CMP's president, that the relationship was considered by all to be one of special trust and not simply a contractual business relationship. *See Carey Elec. Contracting, Inc. v. First Nat'l Bank of Elgin,* 74 Ill.App.3d 233, 30 Ill.Dec. 104, 108–09, 392 N.E.2d 759, 763–64 (1979). While the Illinois courts have never had to address the precise factual situation, its unfair trade practices and fiduciary duty law appears sufficiently flexible to encompass such a relationship. *See Board of Trade v. Dow Jones & Co.,* 108 Ill.App.3d 681, 64 Ill.Dec. 275, 286, 439 N.E.2d 526, 537 (1982), *aff'd,* 98 Ill.2d 109, 74 Ill.Dec. 582, 456 N.E.2d 84 (1983).

While I am able to accept the plaintiff's argument with respect to the breach of fiduciary duty count and the unfair trade practices count up to this point, I cannot make the next, and necessary, step with it. According to the amended complaint, the plaintiff alleges that the gravamen of these counts is the use of trade secrets and other confidential information. As noted earlier, there is no support in the record for this allegation. I believe that, under the facts of this case, Illinois law might find a breach of fiduciary duty in the defendants' competing against the plaintiff after the termination of this close and confidential business arrangement. However, the complaint does not allege, in these two counts, that the defendants breached their duties by competing against the plaintiff.

On this basis, I join the judgment of the court.