# United States Court of Appeals
## For the First Circuit

No. 19-1104

TLS MANAGEMENT AND MARKETING SERVICES, LLC,

Plaintiff, Appellee,

v.

RICKY RODRÍGUEZ-TOLEDO; ASG ACCOUNTING SOLUTIONS GROUP, INC.;
GLOBAL OUTSOURCING SERVICES, LLC,

Defendants, Appellants,

LORRAINE RAMOS; CONJUGAL PARTNERSHIP RODGRIGUEZ-RAMOS; MIGUEL A.
SANTO DOMINGO-ORTIZ; MARI LOURDES CARDONA-JIMENEZ, a/k/a Mari
Santo-Domingo; CONJUGAL PARTNERSHIP SANTO-DOMINGO-CARDONA;
SANDPIPER, LLC; DRRLC & ASSOCIATES, LLC; TRINITY PR, LLC; GLOBAL
TAX STRATEGY; INSURANCE COMPANY A; INSURANCE COMPANY B;
INSURANCE COMPANY C,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Bruce J. McGiverin, U.S. Magistrate Judge]

Before

Barron, Lipez, and Dyk,[*]
Circuit Judges.

Lydia Margarita Ramos Cruz for appellants.
Manuel A. Pietrantoni, with whom Valerie M. Blay-Soler and
Marini Pietrantoni Muñiz LLC, were on brief, for appellee.

---

[*] Of the Federal Circuit, sitting by designation.

July 21, 2020

**DYK, Circuit Judge.** TLS Management and Marketing Services, LLC ("TLS"), sued Ricky Rodríguez-Toledo ("Rodríguez"), ASG Accounting Solutions Group, Inc. ("ASG"), and Global Outsourcing Services, LLC ("GOS") (collectively, "defendants") in the United States District Court for the District of Puerto Rico, alleging trade secret misappropriation (by Rodríguez and ASG) and breach of nondisclosure agreements (by Rodríguez, ASG, and GOS). The district court granted summary judgment to TLS on its breach of contract claims, and after a non-jury trial, found that Rodríguez and ASG were liable for misappropriation of trade secrets.

We reverse because TLS failed to satisfy its burden to prove the existence of trade secrets, and because the nondisclosure agreements are so broad as to be unenforceable. We remand with instructions to enter judgment in favor of the defendants.

## I. Background

The facts are in large part undisputed. Plaintiff TLS was a tax planning and consulting firm based in Puerto Rico. It provided clients with advice to enable them to minimize United States and Puerto Rico tax liabilities. TLS's business was divided into a Consulting Division and Puerto Rico Division. TLS alleged that it generated two trade secrets, the Capital Preservation Report and the U.S. Possession Strategy.

The Consulting Division prepared a Capital Preservation

Report ("CPR") for clients providing tax recommendations specific to each client based on an analysis of applicable statutes and regulations. The trade secret was alleged to be the portion of the CPR not specific to the individual client.

The Puerto Rico Division provided services utilizing the so-called U.S. Possession Strategy ("the Strategy"), which involved the provision of tax advice and tax avoidance services. In essence, the Strategy was a "tax arbitrage" strategy based on the fact that Puerto Rico tax rates were lower than U.S. federal tax rates. Under the Strategy, a participating client, a business owner in the mainland U.S., became a member of a TLS "division," and purchased shares of TLS, signing a "buy-sell agreement" that limited the client's rights to transfer its membership shares. Through a "services agreement," the client's company on the mainland outsourced some business activities (such as marketing) to TLS. TLS and its affiliate had tax exemption grants under Puerto Rico's Act 20 of 2012 (Export Services Act) and Act 73 of 2008 (Economic Incentives Act). A business that held a grant under these Acts was generally subject to a fixed corporate tax rate of 4%, and dividend distributions to its stockholders were not subject to a personal income tax if they were Puerto Rico residents. See P.R. Laws Ann. tit. 13, §§ 10643, 10832, 10834.

Under the Acts, it appears that TLS paid a 4% Puerto Rico tax rate on the outsourcing fees paid to TLS while the same

- 4 -

fees were deductible to the mainland client's company as a business expense and thus not subject to federal or state taxation. If TLS distributed the earnings to the client as a dividend after the client became a Puerto Rico resident, the dividend would be exempt from taxation under the Acts. If the client wished to access the earnings (dividends) before moving to Puerto Rico, the client and TLS entered into a "promissory note" and "security agreement," effectively allowing the client to withdraw the earnings as a tax-free loan. Thus, the effect of the Strategy was that the activities of the client's company in the mainland U.S. would effectively be subject only to a 4% rate on the outsourced services instead of a higher U.S. corporate tax rate on the income from the outsourced services, and that distributions to the client would not be taxed. But a premature termination of the client's "membership" with TLS could result in adverse tax consequences because distributions would not be exempt from tax.

Defendant Rodríguez was the founder of defendant ASG, a company that also offered services in tax planning and accounting. In March 2012, ASG signed a Subcontractor Agreement ("the ASG Agreement") with TLS that included a nondisclosure provision. On September 1, 2012, Rodríguez began working for TLS as its Managing Director and signed a Confidentiality and Non-Disclosure Agreement ("the Rodríguez Agreement"). The ASG and Rodríguez Agreements contained similar nondisclosure provisions governed by Puerto Rico

law.[1]  Rodríguez and ASG's relationship with TLS appears to have concluded in early 2015.

After his departure from TLS, Rodríguez provided tax services in competition with TLS through ASG and GOS (another company in which Rodríguez purchased a majority interest after he left TLS).  Rodríguez was the majority owner of both companies. TLS alleged that Rodríguez and ASG misappropriated trade secrets by utilizing the Strategy trade secret in providing tax services to two former clients of TLS.  These clients sought advice on how to exit their "membership" with TLS.  The clients emailed documents (which they received from TLS) to Rodríguez who then provided comments.  To minimize the tax impact of exiting the membership with TLS, Rodríguez suggested transferring the interest in the TLS division to a new Puerto Rico trust or limited liability company ("LLC") in order to delay tax liability until the clients became Puerto Rico residents.  ASG proceeded to create LLCs for the clients.

On August 17, 2015, TLS sued Rodríguez, ASG, and GOS in the United States District Court for the District of Puerto Rico.[2]

---

[1] The contracts are governed by "the laws of the jurisdiction in which TLS [wa]s domiciled."

[2] TLS also joined numerous other defendants that were later dismissed.  TLS also asserted various other claims based on federal law that were abandoned or rejected by the district court.  Those claims are not the subject of this appeal.  The district court had federal question jurisdiction over the federal claims and

TLS alleged that (1) Rodríguez and ASG misappropriated TLS's trade secrets under P.R. Laws Ann. tit. 10, §§ 4131-41, and (2) Rodríguez, ASG, and GOS breached their nondisclosure agreements.

Rodríguez was alleged to have misappropriated the CPR trade secret by downloading copies of particular CPRs without authorization from TLS's Dropbox account before he left TLS. Rodríguez and ASG were alleged also to have violated the nondisclosure agreements by providing services to the two former clients of TLS and other TLS clients using information protected by the nondisclosure agreements. GOS was alleged to have violated those agreements by using TLS's "loan application" form for its business.

TLS and the defendants filed cross-motions for summary judgment. The district court granted summary judgment to TLS on the breach of contract claims. With respect to these claims, the defendants' primary defense was that they were not liable because the nondisclosure agreements were unenforceable. The district court held that this argument was waived and did not address the argument on the merits. It then concluded that ASG and Rodríguez were liable for "disclosure of the U.S. Possession Strategy and retention of TLS's Confidential Information." Later, in its non-

---

supplemental jurisdiction over the state-law claims.

jury trial opinion, the district court characterized its order granting summary judgment as finding "liability on the part of Rodríguez and ASG for breaching the confidentiality clauses by using TLS's loan agreement and operating agreement, for using and disclosing the Strategy to clients, and for keeping files after employment with TLS ended."

The district court held a non-jury trial on the trade secret claims. TLS presented only two witnesses, Richard Colombik and David Runge, who were principals of TLS. The defendants presented only Rodríguez as a witness. The district court held that TLS's CPR and the Strategy were trade secrets. It then concluded that Rodríguez and ASG misappropriated the Strategy trade secret when Rodríguez and ASG gave advice to two former TLS clients to help them structure their exit from TLS's membership, and that Rodríguez misappropriated the CPR trade secret by downloading two CPRs from TLS's Dropbox account without authorization.[3]

The district court awarded damages for TLS's trade secret claims by trebling the service fees paid by the former clients to ASG. It declined to award damages for breaching the nondisclosure agreements, reasoning that an award would be

_____

[3] The district court stated that Rodríguez "conceded that he acted without authority when he copied" contents in the Dropbox account and that "he did not have authority to refer to TLS information in the[] emails" to these clients.

duplicative of the damages under the trade secrets claims. However, the district court issued a permanent injunction order enjoining the defendants "from using or disclosing any of TLS's 'confidential information' or its trade secrets in violation of, as defined by, the [ASG and Rodríguez Agreements]."

The defendants appeal, arguing that the district court erred in granting summary judgment to TLS as to the breach of contract claims and in denying the defendants' motion for summary judgment, and in holding that TLS proved its trade secret claims at trial.

We have jurisdiction under 28 U.S.C. § 1291. "We review de novo both the entry of summary judgment . . . and the interpretation of the parties' contract[s]." Farthing v. Coco Beach Resort Mgmt., LLC, 864 F.3d 39, 43 (1st Cir. 2017). As for the trade secret claims that were adjudicated by a non-jury trial, we review the district court's legal determination de novo, United States v. 15 Bosworth St., 236 F.3d 50, 53 (1st Cir. 2001), and its factual findings for clear error, Doe v. Harvard Pilgrim Health Care, Inc., 904 F.3d 1, 10 (1st Cir. 2018). We may decide sufficiency of the evidence on our own, even though the district court did not have occasion to do so, when the evidence admits of only one outcome under the correct legal standard. See, e.g., Donovan v. A. Amorello & Sons, Inc., 761 F.2d 61, 66 (1st Cir. 1985) ("[W]here findings are infirm because of an erroneous view

of the law, a remand is the proper course unless the record permits only one resolution of the factual issue." (alteration in original) (quoting Pullman-Standard v. Swint, 456 U.S. 273, 292 (1982))); see also Wright v. Lassiter, 921 F.3d 413, 418-19 (4th Cir.), cert. denied, 140 S. Ct. 165 (2019) ("While we usually remand when the district court has misapplied the relevant legal standard after a bench trial, we may affirm when the evidence permits only one conclusion.").

## II. The Trade Secret Claims

We first address TLS's trade secret claims under Puerto Rico law. The defendants argue that TLS failed to establish that it had trade secrets.

Most forms of intellectual property have boundaries that are defined before the commencement of litigation. In the case of patents the claims define the scope of the patent right, see, e.g., Markman v. Westview Instruments, Inc., 517 U.S. 370, 372-73 (1996), in the case of copyright the federal registration defines the scope of the copyrighted material that can be enforced, Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC, 139 S. Ct. 881, 887 (2019), and in the case of trademark the federal registration and the public use of the mark define the boundaries, see, e.g., Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc., 909 F.3d 1110, 1115-16 (Fed. Cir. 2018). To be sure, there may be and often are disputes as to scope, but the outer bounds are defined

in advance so that competitors can tailor their conduct accordingly. Trade secrets are different. There is no requirement of registration and, by definition, there is no public knowledge of the trade secret in advance of litigation. Even the defendant is not necessarily on notice of the trade secret before litigation. This raises the possibility that the trade secret owner will tailor the scope of the trade secret in litigation to conform to the litigation strategy. The present case illustrates these risks; the alleged trade secrets were not identified by TLS until the eve of trial.

Because of the potentially amorphous nature of trade secrets, Puerto Rico's Industrial and Trade Secret Protection Act ("Trade Secret Act") requires that "[i]n any action filed whereby misappropriation of an industrial or trade secret is alleged under this chapter, the plaintiff, before discovery of proof, shall describe the trade secret as specifically as possible, but without disclosing the same." P.R. Laws Ann. tit. 10, § 4139(a).[4] In addition, the trade secret owner has the burden of proof to establish the existence and scope of the alleged trade secret in

---

[4] On appeal, the defendants argue that TLS's trade secret claims are barred because it failed to timely satisfy section 4139(a)'s requirement that the plaintiff describe the trade secret as specifically as possible before discovery begins. In light of our holding that TLS failed to prove its trade secret claims, we need not address the section 4139(a) requirement.

the litigation.  See, e.g., IDX Sys. Corp. v. Epic Sys. Corp., 285

F.3d 581, 583 (7th Cir. 2002); Composite Marine Propellers, Inc.

v. Van Der Woude, 962 F.2d 1263, 1266 (7th Cir. 1992).

Puerto Rico's Trade Secret Act defines "trade secrets"

to be any information:

> (a)  That  has  a  present  or  a  potential
> independent financial value or that provides
> a  business  advantage,  insofar  as  such
> information is not common knowledge or readily
> accessible through proper means by persons who
> could make a monetary profit from the use or
> disclosure of such information, and

> (b)  for  which  reasonable  security  measures
> have been taken, as circumstances dictate, to
> maintain its confidentiality.

P.R. Laws Ann. tit. 10, § 4132.  This is similar to the definition

in the Uniform Trade Secrets Act ("UTSA") on which the Trade Secret

Act is based.[5]  The statutory definition requires proof that the

alleged trade secret (1) was distinct from general knowledge; (2)

was not readily ascertainable; (3) had independent value; and (4)

was subject to reasonable security measures.

The  Puerto  Rico  Supreme  Court  has  not  further

illuminated    the    elements    for    proving    trade    secret

---

[5] The UTSA defines "trade secret" to mean information that "(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Unif. Trade Secrets Act § 1(4) (amended 1985).

misappropriation. However, the Puerto Rico Supreme Court generally looks at the law of other jurisdictions that have adopted a uniform act when interpreting Commonwealth law that was modeled after the same uniform act. See, e.g., St. Paul Fire & Marine v. Caguas Fed. Savs., 121 D.P.R. 761, 21 P.R. Offic. Trans. 743, 749, 1988 WL 580787 (P.R. 1988). TLS admits that "[t]he Supreme Court of Puerto Rico does regularly look to other jurisdictions and how they've interpreted other statutes that are similar . . . to the particular statute in Puerto Rico [that] the Supreme Court is interpreting." We thus consider court cases from other jurisdictions that have adopted the UTSA in determining whether TLS proved its trade secret claims.[6] See In re Montreal, Maine & Atl. Ry., Ltd., 799 F.3d 1, 10 (1st Cir. 2015) (holding that on an undecided state-law issue federal courts predict "the course that a state court likely would follow" by "begin[ning] with settled principles of state law and then consider[ing] persuasive authority from other jurisdictions and the teachings of learned treatises").

### A. The Alleged CPR Trade Secret

As to the alleged CPR trade secret, the question is whether TLS established that the two CPRs that Rodríguez downloaded

---

[6] The UTSA has been adopted by almost all states in the mainland U.S., the District of Columbia, Puerto Rico, and the U.S. Virgin Islands. See 1 Roger M. Milgrim, Milgrim on Trade Secrets § 1.01 (2020).

satisfied the statutory definition of a trade secret. The district court held that TLS's "CPR itself qualifie[d] as a trade secret . . . because the compilation of [TLS employees'] knowledge and skill, applied to client information, provide[d] TLS with a competitive advantage." However, the district court did not apply the appropriate trade secret definition, and we conclude that, using the correct standard, as a matter of law TLS did not establish that the two CPRs constituted trade secrets.

A CPR is a report that TLS customized for the particular client. It appears that the typical CPR is over a hundred pages in length. It describes public and general information such as the meaning of tax terms, the concept of corporate structures (e.g., comparison between S- and C- corporations), case law, IRS regulations and tax statutes, state tax laws, Puerto Rico tax laws, generic taxation examples, and public trade articles. A CPR also contains individual client information. The district court correctly stated that "individual client information and public information contained in the CPR [we]re not trade secrets," and TLS does not contend otherwise. TLS was required to establish that the CPRs contained information that was not public or client information.

The Restatement (Third) of Unfair Competition (Am. Law Inst. 1995) states the general requirement that "[a] person claiming rights in a trade secret bears the burden of defining the

- 14 -

information for which protection is sought with sufficient definiteness to permit a court to apply the criteria for protection . . . and to determine the fact of an appropriation." Id. § 39 cmt. d; see also id. at cmt. f, reporters' notes at 443. Courts interpreting the UTSA have uniformly followed this requirement. See, e.g., IDX, 285 F.3d at 583 (Wisconsin law); Composite Marine, 962 F.2d at 1266 (Illinois law); Wal-Mart Stores, Inc. v. P.O. Mkt., Inc., 66 S.W.3d 620, 631-32 (Ark. 2002) (collecting cases).

During oral argument, TLS was repeatedly asked what the trade secrets were in the CPRs. It could not articulate what aspects of the CPRs qualified as a trade secret but instead generally referred this court to the record. We have carefully examined the record, and find no evidence that could support a holding that TLS established the existence of a trade secret in the CPRs. TLS's principal, Mr. Colombik, testified that TLS had "approximately 53 different methods or techniques" that it could select for a particular client, but he did not describe what they were. Mr. Colombik referenced only several at a high level--that TLS would conduct a "salary analysis," consider "fringe benefits," look at the client's "retirement plan," and use "captive insurance company" techniques, or decide "whether or not [the client] can get a race car and modify how they use it to write it off as advertising," and that its recommendations would result in tax

savings. Such general description was insufficient to establish a trade secret.

In short, any trade secrets in the CPR were not identifiable because TLS did not "separate the [purported] trade secrets from the other information . . . [that was] known to the trade." IDX, 285 F.3d at 584 (holding that the plaintiff failed to identify trade secrets with specificity because it failed to distinguish what aspects in a 43-page description were known to the trade); SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC, 491 F.3d 350, 354 (8th Cir. 2007) ("[S]imply to assert [that] a trade secret resides in some combination of otherwise known data is not sufficient [to prove a claim], as the combination itself must be delineated with some particularity in establishing its trade secret status." (quoting Jostens, Inc. v. Nat'l Comput., 318 N.W.2d 691, 699 (Minn. 1982))). "[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition [of a trade secret]." IDX, 285 F.3d at 584.[7]

_____

[7] See also Am. Can Co. v. Mansukhani, 742 F.2d 314, 331 & n.21 (7th Cir. 1984) (holding that a party cannot prevent others from using public information and general knowledge); Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 661–62 (4th Cir. 1993) (holding that the plaintiff's allegations were insufficient to show it had trade secrets because no reasonable jury could differentiate them from "matters of general knowledge in the trade" (quoting Diodes, Inc. v. Franzen, 260 Cal. App. 2d 244, 253 (Ct. App. 1968)); MAI Sys. Corp. v. Peak Comput., Inc., 991 F.2d 511, 522 (9th Cir.

It appears that TLS also claims that the process itself to create the CPR was a trade secret. However, TLS also failed to identify what process constituted a trade secret. Because TLS failed to identify the process with specificity, let alone establish what aspects were not readily ascertainable, no reasonable fact finder could determine that TLS proved its claim by merely asserting that the process for compiling the CPR's content (which generally comprised public information) qualified as a trade secret.

Here, TLS made no showing as to what aspects of the CPRs were public knowledge and which were not. We conclude as a matter of law that TLS did not establish that the CPRs contained a trade secret.

## B. The Alleged Strategy Trade Secret

We turn to the question whether the Strategy, described above, was a trade secret. The district court held that the

_____

1993); Composite Marine, 962 F.2d at 1266; Luigino's, Inc. v. Peterson, 317 F.3d 909, 912 (8th Cir. 2003); Givaudan Fragrances Corp. v. Krivda, 639 F. App'x 840, 845 (3d Cir. 2016); Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 61 (1st Cir. 2009), decision clarified on denial of reh'g, 559 F.3d 1 (1st Cir. 2009); AMP, Inc. v. Fleischhacker, 823 F.2d 1199, 1203 (7th Cir. 1987); Litton Sys., Inc. v. Sundstrand Corp., 750 F.2d 952, 960–61 (Fed. Cir. 1984); Quantum Sail Design Grp., LLC v. Jannie Reuvers Sails, Ltd., No. 1:13-CV-879, 2015 WL 404393, at *4 (W.D. Mich. Jan. 29, 2015) ("A party alleging trade secret misappropriation must particularize and identify the purported misappropriated trade secrets with specificity." (quoting Dura Global Techs., Inc. v. Magna Donnelly Corp., 662 F. Supp. 2d 855, 859 (E.D. Mich. 2009))).

- 17 -

Strategy was a trade secret because "it [wa]s a process and method building on the knowledge and experience of employees that [wa]s used to give TLS a business advantage."  Again, we conclude that the district court applied an incorrect definition and that, under the correct definition, TLS failed to show that the Strategy was a trade secret.

To a large extent, the Strategy, like the CPRs, consisted of public knowledge.  The general concept of "tax arbitrage" based on Puerto Rico tax exemption laws was hardly secret.  TLS's own CPR stated that it "[wa]s well established in the Internal Revenue Code and case law" that the combination of the federal and Puerto Rico tax laws allowed "a business [to] reduce or eliminate potential double taxation."

Despite generalized testimony by Mr. Runge that "all . . . methods and procedures and processes [of the Strategy] didn't exist before [TLS] designed them," it is undisputed that most of the individual steps implemented in the Strategy--e.g., a Puerto Rico company obtaining a tax exemption grant, a mainland company outsourcing business activities to Puerto Rico, and a Puerto Rico company issuing shares--were well known.

TLS's principals, Mr. Runge and Mr. Colombik, testified that these components of the Strategy were "standard" and "common." Rodríguez testified that outsourcing business to a "lower tax jurisdiction[]" such as the U.S. Virgin Islands "[had] been done

- 18 -

for a long time," for example, by "companies like Microsoft, Apple," and that such methods were "highly publicized." Rodríguez testified that several individuals in the U.S. Virgin Islands "used the same structure[]" as the Strategy. TLS itself published an article titled "The Puerto Rican Miracle" for prospective clients, stating that "[o]utsourcing [wa]s common and accepted in today's business environment" and many U.S. business owners could own a company in Puerto Rico and outsource part of their business to that company in order to retain profits from the outsourcing at a 4% tax rate. The district court correctly found that "[t]he documents and templates underlying the Strategy [we]re all commonly used in the tax-planning industry," and TLS does not contend otherwise.[8]

However, TLS appears to claim that one aspect of the Strategy--the use of promissory notes and security agreements to enable clients to access distributed profits--was not publicly known. TLS's witnesses--Mr. Colombik and Mr. Runge--testified that the use of the promissory notes and security agreements were

---

[8] The district court also found that "the documents and forms that TLS use[d] to implement the Strategy [we]re not by themselves protectable as trade secrets," "[t]he documents and client identities left exposed in the Dropbox account simply were not protected to a reasonable degree," and "TLS ha[d] not shown that the documents and information underlying the Strategy were the object of reasonable security measures, so those materials [were not] trade secret[s] . . . ."

central to the Strategy, and Mr. Runge testified that TLS invented the method of allowing clients to access their profits through the Strategy and that the "combination of the[] aspects [of the Strategy] [wa]s unique." Mr. Runge testified that he was unaware that anyone else achieved the combination.

In contrast, Rodríguez testified that outsourcing and then "[taking income as] loans . . . over to the [United States]" had been done for a long time. He further testified that "most of the [tax avoidance] models in Puerto Rico came from [the] Virgin Islands, where they've been using these models before" and "using loans[] . . . [wa]s well-covered in many areas[] . . . with the IRS and publicly with multi-national[] [companies] as well." The district court did not resolve the conflicting testimony as to the industry practice. But this is of no consequence. TLS could not claim a trade secret protection simply because its loan strategy was not publicly known. TLS also had to establish that this aspect of the Strategy was not readily ascertainable from public sources. On this issue, TLS presented no evidence. We thus conclude that TLS failed to show that the Strategy was not readily ascertainable.

The district court stated that "[t]he Strategy[] . . . remain[ed] largely either unknown or inaccessible despite the commonly known information underlying it" and that "the knowledge of the Strategy originated with TLS and d[id] not appear to be readily ascertainable by companies unaffiliated with TLS, so [the

Strategy] me[t] the statutory requirement under § 4132(a)." These statements appear to refer to TLS's documents describing the tax scheme labeled as the "Strategy" as opposed to the substance of the scheme. Mr. Runge testified that the "services agreement" for outsourcing had been developed over years and was in its 60th version by the time of trial. However, the proper inquiry is not whether the documents describing TLS's tax scheme were readily ascertainable but rather whether the "substance" of that tax scheme was readily ascertainable. See Convolve, Inc. v. Compaq Comput. Corp., 527 F. App'x 910, 918, 921–22 (Fed. Cir. 2013) (affirming the district court's decision that the plaintiff failed to show that the "substance of the trade secret" satisfied the elements of a trade secret); Patriot Homes, Inc. v. Forest River Hous., Inc., 512 F.3d 412, 415 (7th Cir. 2008) (holding that the plaintiff failed to show the "substance of the 'trade secret'" and was not entitled to a preliminary injunction because the plaintiff only described it as a "'playbook' for constructing modular homes" and failed to prove that the underlying information was not readily available).

We conclude that TLS failed to establish that the Strategy was a trade secret.[9]

---

[9] The parties dispute whether a tax planning scheme can ever be a trade secret. Congress amended the patent statute in 2011 to limit the patentability of tax strategies. Leahy-Smith America

## III. The Breach of Contract Claims

### A.

TLS's second claim is that the defendants breached their nondisclosure agreements by using knowledge gained from TLS to provide tax services to former clients of TLS. The defendants argue that those agreements are unenforceable. The district court held that the defendants waived this argument and did not address the argument on the merits.

The district court's finding of waiver is unsupported. The defendants explicitly argued before the district court that the nondisclosure agreements are unenforceable under the Puerto Rico Supreme Court's decision in Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 1994 P.R.-Eng. 909,262, 1994 WL 909262 (P.R. 1994), a decision we describe later in detail. For present purposes, it is sufficient to note that the Puerto Rico Supreme Court held certain noncompete clauses invalid as contrary to public policy. Here, the defendants argued that the nondisclosure agreements' "applied effect [wa]s the same as a non-competition clause" that "infinitely precluded [them] from utilizing their skills and knowledge to work in any such areas concerning the accounting profession" and thus the agreements "amount[ed] to the equivalent

---

Invents Act, Pub. L. No. 112-29 § 14, 125 Stat. 284, 327–28 (2011). We need not reach this issue as to trade secrets because we conclude that TLS failed to prove that either the CPRs or the Strategy satisfied the elements of a trade secret.

- 22 -

of a restrictive covenant not to compete[] [and] needed to comply with <u>Arthur Young</u>." This is not a situation where the defendants failed to adequately develop argumentation. The defendants preserved the issue of enforceability.

The district court's decision involved a purely legal question--whether the nondisclosure agreements here are unenforceable as a matter of public policy--that was proper for disposition on summary judgment. See <u>Local Motion, Inc.</u> v. <u>Niescher</u>, 105 F.3d 1278, 1280 (9th Cir. 1997) ("Whether the . . . Agreement constituted a valid enforceable contract is a matter of law, and therefore it was proper for the court to determine this issue on summary judgment."); <u>Cameron</u> v. <u>Vancouver Plywood Corp.</u>, 266 F.2d 535, 538-39 (9th Cir. 1959) ("Where the pleadings and depositions show without genuine issue of fact that the contract sued upon is contrary to public policy and void, entry of summary judgment for the defendant is proper.").

<u>B.</u>

On appeal, the defendants argue that the nondisclosure agreements are unenforceable, and TLS argues that the nondisclosure agreements are enforceable. We agree with the defendants.

As the parties agree, the enforceability of the contracts here is governed by Puerto Rico law. In <u>Arthur Young</u>, the Puerto Rico Supreme Court addressed the enforceability of

- 23 -

noncompete agreements. 1994 WL 909262. There a former employee had signed an agreement that prohibited him from providing accounting services to the employer's clients for two years. Id. The court held that the validity of such a prohibition is to be evaluated based on the employer's "legitimate interest" and the restriction on "the employee's freedom of contract and the general public's freedom of choice." Id. This is because an accounting service concerns a client relationship where the "clients' right to select custodians of their financial affairs is paramount, and [that right] may not be unreasonably encumbered." Id. (quoting Mailman, Ross, Toyes & Shapiro v. Edelson, 444 A.2d 75, 80 (N.J. Ch. Div. 1982)). The court held that the noncompetition term "should not [have] exceed[ed] twelve months" and that the employer was not justified in barring the employee from offering services for two years. Id. It reached its decision by relying on Puerto Rico's civil code statutes,[10] other countries' civil laws, and

_____

[10] The court cited to Civil Code § 1207, which provides:

> The contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order.

P.R. Laws Ann. tit. 31, § 3372 (emphasis added), and Civil Code § 1210, which provides:

> Contracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfilment of what has been

common law doctrines. Notably, the court relied on authorities from mainland U.S. jurisdictions in conducting its analysis.

TLS argues that a "confidentiality clause" is not a "non-compete clause" and thus Arthur Young is inapplicable. But overly broad nondisclosure agreements, while not specifically prohibiting an employee from entering into competition with the former employer, raise the same policy concerns about restraining competition as noncompete clauses where, as here, they have the effect of preventing the defendant from competing with the plaintiff. See, e.g., Durham v. Stand-By Labor of Ga., Inc., 198 S.E.2d 145, 149 (Ga. 1973) ("Covenants not to disclose and utilize confidential business information are related to general covenants not to compete because of the similar employer interest in maintaining competitive advantage."); AMP Inc. v. Fleischhacker, 823 F.2d 1199, 1202, 1205 (7th Cir. 1987); Revere Transducers, Inc. v. Deere & Co., 595 N.W.2d 751, 760-62 (Iowa 1999); Nasco, Inc. v. Gimbert, 238 S.E.2d 368, 369 (Ga. 1977).

In Arthur Young, the Puerto Rico Supreme Court held that the noncompete clause was "null and void because it contravene[d] public policy" that a contract's "prohibition cannot be extended

> expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law.

Id. § 3375 (emphasis added).

- 25 -

beyond what is necessary to protect the former employer's legitimate interests" while "unjustifiably restricting the employee's freedom of contract and the general public's freedom of choice." 1994 WL 909262.

The Puerto Rico Supreme Court also cited with approval mainland U.S. case law concerning noncompete clauses. Related mainland U.S. cases concerning noncompete clauses hold that overly broad "[c]onfidentiality agreements . . . constitute[] . . . unreasonable restraints on trade which unduly restrict the free flow of information necessary for business competition" and are thus unenforceable. AMP, 823 F.2d at 1202; Nasco, 238 S.E.2d at 369 ("Covenants against disclosure, like covenants against competition, affect the interests of this state, namely the flow of information needed for competition among businesses, and hence their validity is determined by the public policy of this state."); see also State Med. Oxygen & Supply, Inc. v. Am. Med. Oxygen Co., 782 P.2d 1272, 1274-76 (Mont. 1989). A nondisclosure agreement is overly broad if the restriction is "[un]necessary for the protection of the employer's business," "unreasonably restrictive of the employee's rights," and "prejudicial to the public interest." Revere Transducers, 595 N.W.2d at 762; see also State Med., 782 P.2d at 1275; Nasco, 238 S.E.2d at 369-70.

Numerous courts have identified the types of agreements in which restrictive clauses are overly broad. First, an

- 26 -

employer's interest does not extend to prohibiting the employee from using general knowledge acquired by the employee:

> It has been uniformly held that general knowledge, skill, or facility acquired through training or experience while working for an employer appertain exclusively to the employee. The fact that they were acquired or developed during the employment does not, by itself, give the employer a sufficient interest to support a restraining covenant, even though the on-the-job training has been extensive and costly.

Follmer, Rudzewicz & Co. v. Kosco, 362 N.W.2d 676, 681 n.4 (Mich. 1984) (quoting Harlan M. Blake, Employment Agreements Not to Compete, 73 Harv. L. Rev. 625, 652 (1960)); see also AMP, 823 F.2d at 1202 ("[A]n employee is free to take with him general skills and knowledge acquired during his tenure with his former employer."); Junker v. Plummer, 67 N.E.2d 667, 669 (Mass. 1946) ("The law is well settled that an employee upon terminating his employment may carry away and use the general skill or knowledge acquired during the course of the employment.").

Second, a nondisclosure agreement is overly broad and invalid when the agreement prohibits disclosure of information that "is not in fact confidential," because it is public knowledge. Nagler v. Garcia, 370 F. App'x 678, 681 (6th Cir. 2010) (quoting Follmer, 362 N.W.2d at 683); AssuredPartners, Inc. v. Schmitt, 44 N.E.3d 463, 475-76 (Ill. Ct. App. 2015) (holding unenforceable a nondisclosure provision that protected virtually every kind of

information that the employee learned during his employment, even if nonconfidential).

Third, a nondisclosure agreement is overly broad when it extends to information properly provided to the defendant by third-party sources. See Am. Software USA, Inc. v. Moore, 448 S.E.2d 206, 209 (Ga. 1994) (nondisclosure agreement was valid because it did not apply to "any information properly obtained from a completely independent source" (i.e., third parties)); Pederson v. Arctic Slope Reg'l Corp., 421 P.3d 58, 70 (Alaska), cert. denied, 139 S. Ct. 427 (2018) (same); ACAS Acquisitions (Precitech) Inc. v. Hobert, 923 A.2d 1076, 1090 (N.H. 2007) (same).

All of these factors exist here. The nondisclosure agreement in the Rodríguez Agreement prohibited disclosure of "Confidential Information" broadly defined as:

> 1.2.1. All information[] . . . regarding ("TLS") business methods and procedures, clients or prospective clients, agent lists, marketing channels and relationships, marketing methods, costs, prices, products, formulas, compositions, methods, systems, procedures, prospective and executed contracts and other business arrangements, proposals and project plans, and ("TLS") Affiliates;
>
> 1.2.2. . . . any other information provided to [Rodríguez] by ("TLS") or ("TLS") Affiliates by or in connection with proposing or delivering ("TLS Services") . . . ;
>
> 1.2.3. The identities of agents, contractors, consultants, sales representatives, sales associates, subsidiaries, strategic partners,

- 28 -

licensors, licensees, customers, prospective customers, suppliers, or other service providers or sources of supply including firms in which a ("TLS") Principal may have an ownership interest . . . ;

1.2.4. . . . any other information that [Rodríguez] may obtain knowledge [sic] during his/her tenure while working at ("TLS")[.]

The definition excluded:

1.3. . . . (a) information disclosed by one Party with the prior written consent of the other Party, (b) information that has been previously disclosed by the other Party to the general public, or (c) information that is required to be disclosed pursuant to a valid judicial court order[] . . . .

The nondisclosure agreement's broad scope extended on its face to public information and general knowledge not particular to TLS's business. For example, the agreement covered "any other information [Rodríguez] may obtain knowledge [sic] during his[] tenure" (subclause 1.2.4), "[a]ll information, . . . regarding [TLS's] business" (subclause 1.2.1), and "any other information provided to [Rodríguez] by TLS . . . in connection with [its services]" (subclause 1.2.2), without regard to its confidentiality. The district court admitted that "it [wa]s undisputable that the confidentiality clause is broad." Although the nondisclosure agreement excluded protection of "information that ha[d] been previously disclosed by [TLS] to the general public," this narrow limitation did not exclude information that was otherwise publicly available or that TLS disclosed to the

public after Rodríguez obtained such knowledge or information. TLS admits, for example, that the nondisclosure agreement protected TLS's operating agreement, even though entire sections of that agreement can be found on the internet. The agreement also covered general knowledge that Rodríguez acquired as an employee, and information that was received from third parties, such as TLS's former clients.

The Rodríguez Agreement's astounding breadth and lack of any meaningful limitation restricted Rodríguez's freedom to compete. The nondisclosure agreement "exceed[ed] the real need to protect [TLS] from . . . competition," essentially tied TLS's clients to its services, and "excessively and unjustifiably restrict[ed] . . . the general public's freedom of choice." Arthur Young, 1994 WL 909262. Similar broad agreements have been uniformly held invalid. See, e.g., Nasco, 238 S.E.2d at 369-70 (nondisclosure agreement prohibiting former employee from disclosing "any information" relating to employer's business was unenforceable); State Med., 782 P.2d at 1273-75 (same); AMP, 823 F.2d at 1202; (same); Nagler, 370 F. App'x at 681 (nondisclosure agreement prohibiting business partner from disclosing nonconfidential information was unenforceable). Based on Arthur Young and case law from the mainland U.S., we conclude that the Puerto Rico Supreme Court would apply the principles articulated in Arthur Young to the nondisclosure agreement here and that it is

so broad as to be unenforceable.

The ASG Agreement contained language similar to that in the Rodríguez Agreement, and suffered from the same problems as the Rodríguez Agreement.[11] Although TLS suggests that Arthur Young does not apply to the ASG Agreement because it was not an employment contract, the Puerto Rico Supreme Court has found noncompetition clauses in agreements other than employment contracts. See Rojas-Buscaglia v. Taburno-Vasarhelyi, No. CV 13-1766, 2015 WL 13547579, at *1 (D.P.R. July 8, 2015) (discussing Puerto Rico cases, including Martin's BBQ v. Garcia De Gracia, 178 P.R. Dec. 978, 990 (P.R. 2010) (franchise contracts)).

While there was no separate agreement between TLS and GOS, the district court assumed that GOS was bound by the ASG and Rodríguez Agreements.[12] Thus, the invalidity of any nondisclosure agreement with GOS follows from the invalidity of the ASG and Rodríguez agreements.

Here, we hold only that the nondisclosure provisions concerning confidentiality in the Rodríguez and ASG Agreements are

---

[11] TLS argues that Rodríguez was bound by the ASG Agreement. Even if Rodríguez had been initially bound by the ASG Agreement, the later Rodríguez Agreement superseded the ASG Agreement as to Rodríguez. Thus, he was not bound by the nondisclosure provision of the ASG Agreement.

[12] The district court appears to have concluded that GOS was bound by the nondisclosure agreements because Rodríguez controlled GOS. We need not determine whether GOS was bound because we hold that the nondisclosure agreements are unenforceable in any event.

unenforceable and do not reach the question whether other provisions of the Agreements survive. We decline to rewrite the nondisclosure agreements by narrowing their scope to be reasonable. The Puerto Rico Supreme Court has held in the context of noncompete agreements that courts may not "modify[] the will of the parties to adjust [the agreements] to reasonable standards." Arthur Young, 1994 WL 909262; see also PACIV, Inc. v. Perez Rivera, 159 D.P.R. 523, 2003 WL 21212748, P.R. Offic. Trans. (P.R. 2003) (holding that an overly broad noncompete agreement "result[ed] in the nullity of the agreement without any possibility of allowing a modification" and "the severability clause [of the agreement did] not save those clauses that d[id] comply with [the court's] pronouncements . . . [and] the agreement [wa]s void in its entirety").[13]

Here, the defendants argue that the same rule applies to nondisclosure agreements and that the nondisclosure agreements here are invalid in their entirety. TLS fails to argue that some portion of the nondisclosure agreements could survive a

---

[13] We note that other mainland U.S. courts have reached the same conclusion as to nondisclosure agreements. See AMP, 823 F.2d at 1202 (voiding nondisclosure agreement in its entirety without severance); State Med., 782 P.2d at 1973-75 (same); Nasco, 238 S.E.2d at 369-70 (same); see also Broadley v. Mashpee Neck Marina, Inc., 471 F.3d 272, 274-76 (1st Cir. 2006) (holding that the district court's rewriting of an overly broad and unenforceable exculpatory clause under admiralty law was against sound public policy).

determination that they were unreasonably broad and thus waived such an argument. See Ortega Cabrera v. Municipality of Bayamon, 562 F.2d 91, 102 n.10 (1st Cir. 1977).

The district court erred by granting TLS's summary judgment motion and denying the defendants' cross-motion as to the claim for breach of nondisclosure agreements.

## IV. Conclusion

We reverse the district court's decisions because TLS failed to prove its trade secret claims, and because the nondisclosure agreements are unenforceable. We remand with instructions to enter judgment in favor of the defendants.

**Reversed and remanded.**