**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 22, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DOUBLE EAGLE ALLOYS, INC.,

    Plaintiff - Appellant,

v.

MICHAEL HOOPER; ACE ALLOYS,
LLC,

    Defendants - Appellees.

No. 24-5089

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:19-CV-00243-JDR-CDL)**
_____

Jason S. Taylor (Hayley N. Stephens and Kayla Finnegan, with him on the briefs) of Conner & Winters, LLP, Tulsa, Oklahoma, for Plaintiff-Appellant.

Ryan A. Ray (David R. Ross, with him on the brief) of Norman Wohlgemuth, LLP, Tulsa, Oklahoma, for Defendants-Appellees.
_____

Before **BACHARACH**, **SEYMOUR**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

Double Eagle Alloys, Inc. appeals the district court's order granting summary judgment to Ace Alloys, LLC and Michael Hooper on all claims. This litigation arises from Michael Hooper's possession of digital files containing

Double Eagle's business information. After a decade-long career at Double Eagle, Hooper jumped ship for competitor Ace Alloys. He also took 2,660 files downloaded from his Double Eagle computer with him. Double Eagle later discovered the download and sued both Hooper and Ace Alloys, alleging trade-secret violations, misappropriation of confidential business information, and civil conspiracy. After the parties conducted discovery, they cross-moved for summary judgment. The district court granted summary judgment to Hooper and Ace Alloys on all claims.

On appeal, Double Eagle challenges the district court's rulings on three fronts. First, Double Eagle asserts that it had identified the alleged trade secrets with sufficient particularity to maintain its trade-secret claims. Second, Double Eagle contends that its business information was confidential to sustain its misappropriation claim. And third, Double Eagle argues that the trade-secret and misappropriation claims qualify as underlying torts to support the civil-conspiracy claim. We disagree and so, exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### I.    Factual Background[1]

---

[1] "In reciting the facts of this case, we view the evidence in the light most favorable to the non-moving party, as is appropriate when reviewing a grant of summary judgment." *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1151 n.1 (10th Cir. 2016) (internal quotation marks omitted).

### A.     Hooper's Job Change

Double Eagle and Ace Alloys are specialty-metals distributors. They buy and resell alloys for companies in the oil-and-gas industry.[2] Double Eagle is the established player, while Ace Alloys is the industry upstart. Ace Alloys directly competes with Double Eagle. Michael Hooper is a former Double Eagle employee who now works for Ace Alloys. His conduct during that job transition is the subject of this litigation.

Hooper had worked as the Inside Sales Manager at Double Eagle for nearly five years before resigning and joining Ace Alloys.[3] When he left for Ace Alloys, he took his handwritten notes and 2,660 digital files, which he downloaded from his Double Eagle computer to an external storage device. The digital files contained Double Eagle's important sales information. Double Eagle later discovered the download and filed suit.

### B.     The Alleged Trade Secrets

Double Eagle contends that the financial, technical, and business information contained in the downloaded files qualifies as trade secrets. On appeal, Double Eagle categorizes the downloaded files into three types of trade

---

[2] An alloy is a fused substance composed of two or more metals or a metal and a nonmetal. *Alloy*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/alloy (last visited Apr. 21, 2025).

[3] Before becoming the Inside Sales Manager, Hooper had worked as a saw operator and in an inside-sales position for Double Eagle from 2007 to 2014.

secrets: (1) pump-shaft-quality (PSQ) specifications, (2) pricing, and (3) customer drawings.[4] We provide an overview of each trade-secret category.

### 1.    PSQ Specifications

Within the specialty-metals industry is a sub-industry for supplying PSQ material to the oil-and-gas industry. Companies that sell PSQ material often develop specifications for PSQ alloys that they supply to their customers. These specifications list the packaging requirements, chemical composition, mechanical properties, bar condition, and other standards for the PSQ-alloy product. PSQ specifications aggregate the preferences of various customers and allow the distributor to purchase material suitable to multiple customers, as opposed to a single customer.

Double Eagle is no exception. It has developed its own specifications for various PSQ materials, including the 718 and K500 PSQ specifications. *See* Sealed App. vol. III, at 503–06. According to Double Eagle, its PSQ specifications qualify as trade secrets and disclosure of these specifications would cause substantial competitive harm.

---

[4] In the district court, Double Eagle identified its trade secrets as "PSQ specifications, pricing, margins, costs, and customer drawings." *Double Eagle Alloys, Inc. v. Hooper*, No. 4:19-CV-00243-JDR-CDL, 2024 WL 3166921, at *2 (N.D. Okla. June 25, 2024) (internal quotation marks omitted). On appeal, Double Eagle subsumed margins and costs into the pricing category.

### 2. Pricing

The downloaded files also contain information on Double Eagle's pricing. Double Eagle sets prices based on the published surcharge, machining costs, material costs, and customer-specific target margins.[5] Sealed App. vol. VI, at 1117. The material costs and customer-specific target margins are, according to Double Eagle, "highly confidential." *Id.* Double Eagle maintains detailed spreadsheets of its machining costs, material costs, inventory levels, and customer purchasing history (actual and targeted margins). Sealed App. vol. III, at 507–14, 522–24. Though Double Eagle shares its prices with customers, it does not share its pricing model. Sealed App. vol. VI, at 1117. Double Eagle claims its pricing model as a trade secret.

### 3. Customer Drawings

Finally, the downloaded files include customer drawings. As routine business practice, customers prepare and share drawings of requested parts with distributors. *See* Sealed App. vol. II, at 333 (example drawing). The distributors, in turn, quote prices for the requested parts based on the drawings. A specialty-metals distributor must have these customer drawings to quote prices for various parts. Double Eagle contends that these customer drawings are trade secrets.

---

[5] "Margin" refers to a markup. Sealed App. vol. I, at 115.

5

## II.    Procedural Background

After discovering the file download, Double Eagle sued Ace Alloys and Hooper. The complaint made five claims for relief, four of which are relevant to this appeal: violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 et seq.; violation of the Oklahoma Uniform Trade Secrets Act (OUTSA), Okla. Stat. tit. 78, § 86; misappropriation of business information; and civil conspiracy.[6]

Double Eagle and Defendants cross-moved for summary judgment. Double Eagle requested summary judgment on its trade-secret claims, reserving the issue of damages for trial. Defendants responded that Double Eagle failed to identify its trade secrets with the required specificity to permit summary judgment. Defendants moved for summary judgment on all claims. They acknowledged that Double Eagle had "identified the alleged trade secrets and [confidential business information] at issue" but argued that Hooper did not use any information from the downloaded files to compete with Double Eagle. App. vol. II, at 236–37. Defendants also argued that Double Eagle's prices and PSQ specifications were not trade secrets, because Double Eagle had shared the information with customers or online.

---

[6] The district court dismissed the claim for fraud and related activity in connection with computers, 18 U.S.C. § 1030. *Double Eagle*, 2024 WL 3166921, at *5. Double Eagle does not appeal this dismissal.

6

On the summary-judgment motions, the district court ordered supplemental briefing. App. vol. III, at 548–50. The district court notified the parties that it intended to consider four other issues when deciding whether to grant summary judgment to Defendants:

(1) whether Double Eagle has sufficiently identified the allegedly misappropriated trade secrets and business information;

(2) whether Double Eagle has taken reasonable measures to maintain the secrecy of the identified trade secrets;

(3) whether the identified trade secrets derive independent economic value from not being generally known or ascertainable through proper means; and

(4) whether the allegedly misappropriated business information is of a secret or confidential character.

*Id.* at 549. The district court acknowledged that Defendants had not asserted any of these grounds in their motion for summary judgment and therefore provided notice through its supplemental briefing order. *Id.* at 548–50. The parties submitted briefs as requested. *Id.* at 551, 577.

After briefing was complete, the district court granted summary judgment to Defendants on all claims. *Double Eagle Alloys, Inc. v. Hooper*, No. 4:19-CV-00243-JDR-CDL, 2024 WL 3166921, at *5 (N.D. Okla. June 25, 2024). Starting with the trade-secret claims under the DTSA and OUTSA, the district court held that "Double Eagle failed to identify its alleged trade secrets with sufficient particularity and clarity to proceed to trial." *Id.* at *1. The district court viewed Double Eagle as "ma[king] no effort to differentiate between the components of the download that cannot qualify as trade secrets . . . and those

7

that meet the requirements for protection under the DTSA and OUTSA." *Id.* According to the district court, Double Eagle's identification of trade secrets as "PSQ specifications, pricing, margins, costs, and customer drawings" did not set forth facts sufficient for a trade secret. *Id.* at *2 (internal quotation marks omitted). Because "Double Eagle ha[d] done nothing to distinguish the wheat from the chaff," the district court granted summary judgment to Defendants on the DTSA and OUTSA claims. *Id.* at *4.

The district court granted summary judgment to Defendants on the misappropriation claim as well. *Id.* It stated that Double Eagle failed to present evidence of the information's secrecy. *Id.* The court noted that the same reasons for dismissing the trade-secret claims applied to this claim. *Id.*

Finally, the district court dismissed the civil-conspiracy claim. *Id.* at *5. The court reasoned that the dismissal of all other claims deprived this claim of any underlying tort, as required for civil conspiracy. *Id.* Therefore, the district court granted summary judgment to Ace Alloys and Hooper on all claims. *Id.* Double Eagle timely appealed the district court's summary-judgment grant.

## DISCUSSION

We review de novo a district court's grant of summary judgment. *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1107 (10th Cir. 2009). "Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Id.* at 1108

8

(quoting Fed. R. Civ. P. 56(c)). "In our review, we examine the evidence and draw reasonable inferences therefrom in the light most favorable to the non-moving party." *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003). But "mere speculation, conjecture, or surmise" cannot defeat summary judgment, because "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Double Eagle appeals the district court's order granting summary judgment on the trade-secret claims, the misappropriation claim, and the civil-conspiracy claim. First, for the trade-secret claims, Double Eagle argues that the evidence created a genuine dispute of material fact on whether it identified its trade secrets with sufficient particularity. Second, Double Eagle asserts that the district court erred in dismissing the misappropriation claim, because a reasonable jury could find that Double Eagle's business information was confidential. Double Eagle also claims that the district court erred by failing to provide an opportunity for Double Eagle to supplement its evidence in support of this claim. Third, Double Eagle argues that if we reverse the dismissal of any other claim, we must also reverse the dismissal of the civil-conspiracy claim. We take each argument in turn.

## I.     Trade-Secret Claims

To start, Double Eagle argues that the district court erred by dismissing the two trade-secret claims under the DTSA and OUTSA. Double Eagle

9

contends (1) that it sufficiently identified its trade secrets, and (2) that genuine disputes of material fact preclude summary judgment on the trade-secret claims. We first review the legal standard and then discuss Double Eagle's arguments.

### A.    Legal Standard

The DTSA permits "[a]n owner of a trade secret that is misappropriated" to file suit "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To establish a claim under the DTSA, the plaintiff must demonstrate "(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 141 (4th Cir. 2023) (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021)); *see, e.g.*, *API Ams. Inc. v. Miller*, 380 F. Supp. 3d 1141, 1147–48 (D. Kan. 2019); *Video Gaming Techs., Inc. v. Castle Hill Studios LLC*, No. 4:17-CV-00454-GKF-JFJ, 2018 WL 3437083, at *4 (N.D. Okla. July 17, 2018).

For the first element, a "trade secret" may include "all forms and types of financial, business, scientific, technical, economic, or engineering information[.]" 18 U.S.C. § 1839(3). To qualify as a trade secret, (1) the owner must have "taken reasonable measures to keep such information secret," and (2) the information must derive "independent economic value, actual or potential, from not being generally known to, and not being readily

ascertainable through proper means by, another person who can obtain

economic value from the disclosure or use of the information[.]" *Id.* The DTSA

lays out some examples of potential trade secrets:

> patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing[.]

*Id.*

The OUTSA similarly allows an individual to file suit for

misappropriation of trade secrets. Okla. Stat. tit. 78, §§ 86–88. "To prove

misappropriation of a trade secret, [a plaintiff] must show (i) the existence of a

trade secret, (ii) misappropriation of the secret by defendants, and (iii) use of

the secret to [a plaintiff's] detriment." *MTG Guarnieri Mfg., Inc. v. Clouatre*,

239 P.3d 202, 209 (Okla. Civ. App. 2010); *see also Musket Corp. v. Star Fuel*

*of Okla., LLC*, 606 F. App'x 439, 451 (10th Cir. 2015). The first two elements

align with the elements under the DTSA, but the third element creates a higher

burden than the DTSA to establish a trade-secret misappropriation claim. *See*

*Blue Star Land Servs., LLC v. Coleman*, No. 5:17-CV-00931-R, 2017 WL

6210901, at *7 (W.D. Okla. Dec. 8, 2017).

For the first element, the OUTSA defines "trade secret" as,

> information, including a formula, pattern, compilation, program, device, method, technique or process, that:

> > a. derives independent economic value, actual or potential, from not being generally known to, and not

11

being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

b. is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Okla. Stat. tit. 78, § 86(4). The OUTSA's definition of "trade secret" is nearly identical to the definition in the DTSA.[7] *Blue Star Land Servs.*, 2017 WL 6210901, at *7. Under both the DTSA and OUTSA, whether certain information qualifies as a trade secret is a question of fact. *See Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 801 (2d Cir. 2023); *Pre-Paid Legal Servs., Inc. v. Cahill*, 171 F. Supp. 3d 1219, 1227 (E.D. Okla. 2016).

## B.    Double Eagle failed to define its trade secrets with sufficient particularity.

On appeal, the parties focus on the first element of the DTSA and OUTSA claims: the existence of a trade secret.[8] The district court dismissed

---

[7] The definition of trade secret under the OUTSA is identical to the definition of trade secret under the Uniform Trade Secrets Act (UTSA). Unif. Trade Secrets Act § 1(4) (amended 1985). Nearly all states and U.S. territories have adopted the UTSA. *See* 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.01 (2024). When interpreting a specific state's trade-secret statute, courts routinely look to caselaw discussing other states' versions of the UTSA as persuasive authority. *See, e.g.*, *TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*, 966 F.3d 46, 53 (1st Cir. 2020) (citing Wisconsin law and Illinois law in interpreting Puerto Rico's version of the UTSA).

[8] The district court analyzed the DTSA and OUTSA claims together, because the elements of both claims are substantially similar. *Double Eagle*, 2024 WL 3166921, at *1–4; *see also Analog Techs., Inc. v. Analog Devices,*

(*footnote continued*)

these claims after concluding that Double Eagle identified no trade secrets "with sufficient particularity." *Double Eagle*, 2024 WL 3166921, at \*1. Double Eagle contends that a reasonable jury could find the existence of trade secrets.

Under the DTSA and OUTSA, a plaintiff "must identify the trade secrets and carry the burden of showing they exist." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (internal quotation marks omitted) (DTSA); *see Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1190 (10th Cir. 2009) (OUTSA); *see also LS3 Inc. v. Cherokee Nation Strategic Programs, L.L.C.*, No. 21-1385, 2022 WL 3440692, at \*5 (10th Cir. Aug. 17, 2022) (unpublished) (affirming the dismissals of the DTSA and Colorado Uniform Trade Secrets Act claims for failing to allege "exactly what trade secrets were stolen" (internal quotation marks omitted)). "The plaintiff should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." *InteliClear*, 978 F.3d at 658 (cleaned up) (DTSA); *see Tri-State Floors, Inc. v. Old Rule Servs., LLC*, No. 4:19-CV-00707-JFH-JFJ, 2022 WL 4653717, at \*7, \*12 (N.D. Okla. Sept. 30, 2022) (applying the particularity requirement to a DTSA claim and then noting

---

*Inc.*, 105 F.4th 13, 17–18 (1st Cir. 2024); *ATS Grp., LLC v. Legacy Tank & Indus. Servs. LLC*, 407 F. Supp. 3d 1186, 1200 (W.D. Okla. 2019). Neither party challenges this joint analysis, nor do they make separate arguments for the DTSA and OUTSA claims. So unless specified otherwise, we analyze the claims together as well.

that the OUTSA claim has overlapping elements).[9] This particularity requirement ensures that defendants have "concrete identification to prepare a rebuttal." *InteliClear*, 978 F.3d at 658 (internal quotation marks omitted).

For particularity, the plaintiff "must clearly refer to tangible trade secret material instead of referring to a system which *potentially* qualifies for trade secret protection." *Id.* (internal quotation marks omitted). "It is inadequate for plaintiffs to cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information." *Id.* (internal quotation marks omitted). "Long lists of general areas of information containing unidentified trade secrets," "catchall phrases," and "categories of trade secrets" that the plaintiff intends to pursue at trial fail to identify the trade secret with sufficient particularity. *Id.* (internal quotation marks omitted). With these parameters in mind, we review the three categories of alleged trade secrets: (1) PSQ specifications, (2) pricing, and (3) customer drawings.

---

[9] Other circuits have also required trade-secret plaintiffs to identify the trade secrets with sufficient particularity under both the DTSA and the state's version of the UTSA. *See Syntel Sterling Best Shores Mauritius*, 68 F.4th at 800 ("Under both the DTSA and New York law, a claimant bears the burden of identifying a purported trade secret with sufficient specificity."); *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 381 (6th Cir. 2022) ("The trade secret must be defined with 'reasonable particularity.'"); *Oakwood Lab'ys*, 999 F.3d at 906–07 (concluding that the complaint alleged trade secrets "with sufficient particularity" (internal quotation marks omitted)).

### 1.    PSQ Specifications

First, Double Eagle argues that its PSQ specifications qualify as trade secrets. Double Eagle contends that it "described how the PSQ specifications were derived and explained their purpose and usefulness." Op. Br. at 26. It cites the 718 and K500 specifications as examples. The district court rejected this claim because "Double Eagle has not introduced any evidence that its . . . specifications were subject to the general protections it identified, were known only to a limited number of people, were not readily ascertainable, or were valuable because they were not widely known." *Double Eagle*, 2024 WL 3166921, at *3. We agree with this assessment.

For the PSQ specifications to qualify as trade secrets, Double Eagle must show that the specifications were not "readily ascertainable" through proper means. § 1839(3)(B); Okla. Stat. tit. 78, § 86(4)(a). This is a more exacting standard than merely showing that the PSQ specifications were not publicly known. *See TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*, 966 F.3d 46, 55 (1st Cir. 2020) ("[The plaintiff] could not claim a trade secret protection simply because its loan strategy was not publicly known."). Instead, Double Eagle must provide sufficient evidence that would allow a jury to find that the PSQ specifications were "not readily ascertainable from public sources." *Id.*

Here, the undisputed evidence reveals that Double Eagle publicly posted certain aspects of the 718 PSQ specification on its website, including a nearly identical chemical composition. App. vol. II, at 398–401. Double Eagle's

15

customers also have similar 718 and K500 PSQ specifications. *See* Sealed App. vol. II, at 310–14 (Baker Hughes's 718 specification), 315–19 (Schlumberger's 718 specification), 320–23 (Wood Group's 718 specification), 324–27 (Summit's 718 specification); Sealed App. vol. VII, at 1410–14 (Baker Hughes's K500 specification). For example, a comparison of the chemical compositions for Double Eagle's 718 PSQ specification and Baker Hughes's 718 PSQ specification shows minimal differences in the weight percentage of just three of the fifteen elements in the alloy. *Compare* Sealed App. vol. III, at 503 (Double Eagle's 718 PSQ specification), *with* Sealed App. vol. II, at 311 (Baker Hughes's 718 PSQ specification). And the chemical compositions for Summit's 718 PSQ specification and Double Eagle's 718 PSQ specification are identical, save for one additional element in Summit's specification. *Compare* Sealed App. vol. III, at 503 (Double Eagle's 718 PSQ specification), *with* Sealed App. vol. II, at 324 (Summit's 718 PSQ specification).

The undisputed evidence also demonstrates that Ace Alloys developed its own 718 and K500 specifications almost a year before Hooper even left Double Eagle. Again, these specifications are nearly identical to Double Eagle's specifications. For example, the chemical compositions of the 718 PSQ specifications contain only minor differences in the weight percentage for three of fifteen elements. *Compare* Sealed App. vol. III, at 503 (Double Eagle's 718 PSQ specification), *with* Sealed App. vol. II, at 345 (Ace Alloys's 718 PSQ

16

specification). The record reveals widespread use of near-identical PSQ specifications among distributors and customers.

The undisputed evidence further shows that Double Eagle and other distributors provided, as routine business practice, material test reports with PSQ specifications for the ordered alloys to their customers. App. vol. II, at 311–12; Sealed App. vol. II, at 391–93. And the evidence demonstrates that Double Eagle did not maintain any confidentiality agreement for these material test reports.[10] Sealed App. vol. II, at 391–93 (Double Eagle employee stating that no agreement limits customers' dissemination of material test reports). In fact, Ace Alloys even received two of Double Eagle's material test reports from Tulsa Centerless Bar Processing, Inc. App. vol. II, at 373–75 (email, dated August 1, 2018, from Tulsa Centerless to Ace Alloys with Double Eagle's specifications for the K500 alloy product attached), 381–93 (same but dated August 10, 2021, for the 718 alloy product). We acknowledge that the material test reports deal only with the specific alloy product delivered to the

---

[10] Double Eagle has a confidentiality agreement with Tulsa Centerless Bar Processing, Inc., a machining company that Double Eagle uses to create its customers' requested parts. The agreement prohibits Tulsa Centerless from disclosing Double Eagle's proprietary information. But the record shows that the mills produce the material test reports, not Double Eagle. *See* App. vol. II, at 373–75 (material test report from Carpenter Technology Corporation), 381–93 (same). Double Eagle also cites no evidence that Tulsa Centerless received the material test reports from Double Eagle, rather than a third party. The evidence fails to demonstrate that the material test reports fall within the purview of Double Eagle's confidentiality agreement with Tulsa Centerless.

customer.[11] But alongside the other undisputed evidence, the material test reports support the readily ascertainable nature of Double Eagle's PSQ specifications.

We have parsed some of the readily ascertainable information in the PSQ specifications. And perhaps other portions of Double Eagle's 718 and K500 PSQ specifications are also readily ascertainable. But Double Eagle merely points to the specifications without distinguishing the trade-secret information from the rest. "[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002). And given the substantial overlap between Double Eagle's specifications and the specifications of both its customers and Ace Alloys, we find it even more critical that Double Eagle cite evidence explaining how these minor differences allow Double Eagle's specifications to

---

[11] The chemical compositions in Double Eagle's PSQ specifications list acceptable ranges for the weight percentages of each element that an alloy may contain, while the chemical compositions in the material test reports list the *actual* weight percentage of each element contained in the specific alloy product delivered to the customer. *Compare* Sealed App. vol. III, at 503 (Double Eagle's 718 PSQ specification), *with* App. vol. II, at 389 (material test report for 718 alloy product). But the material test reports still reveal every element in the alloy, as outlined in the PSQ specifications, and the weight percentages fall within the specifications' ranges.

qualify as trade secrets.[12] But Double Eagle left us to hunt through thousands of pages to determine which portions of the specifications might qualify as trade secrets. For the portions of Double Eagle's 718 and K500 PSQ specifications that differ from their customers' specifications, from Ace Alloys's specifications, or from the specifications in the material test reports, Double Eagle has provided no information on how they qualify as trade secrets.[13]

---

[12] During a deposition, Crissup attempted to explain how the mechanical properties and tensile strength make Double Eagle's specifications different from other publicly available specifications. Sealed App. vol. I, at 54–59. He stated that the 718 PSQ specification and the publicly available 718 specification on Double Eagle's website were "night and day" and claimed that a metallurgist would label it as "nothing." *Id.* at 55. But in the portion of the deposition cited by Double Eagle, Crissup never gave any context for the identified differences or explained their significance. *Id.* at 55–57. His generalized and conclusory statements provide no value to our inquiry.

[13] Double Eagle attempts to analogize this case to *Broad-Ocean Technologies, LLC v. Lei*, 649 F. Supp. 3d 584 (E.D. Mich. 2023). In *Broad-Ocean*, an employer sued a former employee for taking over 600 downloaded files. *Id.* at 588–89. The district court held that the employer identified the alleged trade secrets with sufficient particularity to survive summary judgment. *Id.* at 595. In reaching this conclusion, the district court highlighted that the alleged trade secrets—computer-aided design models of fuel-cell technology components—"inherently are more secret than the business processes and strategies, categories of information, or 'low technology commodity products' considered by other courts." *Id.* at 594. The district court also noted the employee's extraordinary efforts to cover his tracks by using his superior technical knowledge to conceal the download. *Id.* at 595. The circumstances in *Broad-Ocean* differ from those here. Double Eagle's alleged trade secrets—the PSQ specifications, pricing, and customer drawings—fall in the latter bucket of business strategy and low-technology products. The facts that supported the inherent secrecy of the trade secrets in *Broad-Ocean* are not present here. Double Eagle also fails to show any similar level of intentional concealment from Hooper or Ace Alloys that the former *Broad-Ocean* employee exhibited when taking the downloaded files. To the contrary, a forensic specialist

(*footnote continued*)

Double Eagle's arguments to the contrary suffer from a lack of evidence as well. Double Eagle claims that its specifications as a whole qualify as trade secrets, because Double Eagle derived these specifications by combining the specifications of its customers. "A trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Harvey Barnett, Inc.*, 338 F.3d at 1129 (cleaned up). But Double Eagle provides no evidence or argument (1) that its customers' specifications are not readily ascertainable (and the evidence suggests otherwise), or (2) that its customers are not readily ascertainable. *See* Fed. R. Civ. P. 56(e)(2). Double Eagle fails to even support its assertion that it developed these specifications over several years. At best, Double Eagle cites an affidavit from its president, Chad Crissup, stating that the downloaded files contain information that "has been compiled by Double Eagle over many years[.]" Sealed App. vol. III, at 524. None of the cites specifically address Double Eagle's PSQ specifications. Without any evidence in the record, a reasonable jury could not find that Double Eagle's PSQ specifications are not readily ascertainable.

---

appeared to have quickly identified Hooper's downloaded files. *See* Sealed App. vol. III, at 522. So Double Eagle's comparison of this case to *Broad-Ocean* holds little persuasive value.

20

Double Eagle claims that, to create a specification like Double Eagle's, a company would need to have specifications from the same customers as Double Eagle. This inference appears reasonable, but the citation to the record does not support Double Eagle's assertion. Double Eagle cites a deposition with Ace Alloys's co-founder, James Simmons, in which he describes how Ace Alloys takes its customers' standards and creates specifications that cover multiple customers. *Id.* at 414. We imagine that Double Eagle likely does the same for its specifications, but the record cites do not describe Double Eagle's process. Double Eagle also claims that the disclosure of its PSQ specifications would cause substantial competitive harm. But again, Double Eagle cites an affidavit from Ace Alloys's other co-founder, Brandon Gerhart, that describes how producing documents on Ace Alloys's specifications "would result in substantial competitive harm to Ace[.]" App. vol. I, at 105. Like Double Eagle's other claims, the record cite does not directly support its assertion and instead relies on us to infer that statements about Ace Alloys somehow apply to Double Eagle as well.

Double Eagle cites no evidence describing the significance of its specifications, the time and effort required to create the specifications, the competitive advantage that these specifications afford to Double Eagle, or the uniqueness of Double Eagle's specifications compared to other distributors. The only evidence that Double Eagle points to is (1) testimony from Simmons about how Ace Alloys creates its specifications, Sealed App. vol. III, at 414;

(2) an affidavit from Crissup stating that "[a]ll of the Double Eagle information downloaded by Hooper is protected, confidential, and not available to the public or other persons who can obtain economic value from its disclosure or use," and that the specifications "could be used to gain a competitive advantage over Double Eagle," *id.* at 524; and (3) vague references about how Double Eagle's specifications would "speed[] things up" for Ace Alloys, *id.* at 470. The cited evidence is either too generalized and conclusory or requires us to infer that information about Ace Alloys's specifications applies to Double Eagle's as well. For these reasons, Double Eagle fails to provide sufficient evidence to create a triable issue on whether the PSQ specifications qualify as trade secrets. *See* Fed. R. Civ. P. 56(e)(3); *Bones*, 366 F.3d at 875.

### 2.    Pricing

Next, Double Eagle argues that its pricing information qualifies as trade secrets. The district court correctly concluded that Double Eagle's prices are not trade secrets, because Double Eagle shares its prices with customers and does not prevent its customers from sharing those prices. *Double Eagle*, 2024 WL 3166921, at \*2; *see* § 1839(3) (defining trade secret as information that is not readily ascertainable); Okla. Stat. tit. 78, § 86(4) (same); *see also Sw. Stainless*, 582 F.3d at 1190 (finding no trade secret where the plaintiff disclosed the alleged trade secret—a quoted price—to the customer and the customer could freely share the quoted price). On appeal, Double Eagle

22

acknowledges sharing prices with customers but contends that its pricing model qualifies as a trade secret.

"As a general matter, confidential data regarding operating and pricing policies can qualify as trade secrets." *Sw. Stainless*, 582 F.3d at 1189 (cleaned up). But the plaintiff must provide evidence that the pricing structure conferred some type of competitive advantage or economic value to the information's owner. *See* § 1839(3) (requiring that the information derive independent economic value from not being generally known or readily ascertainable through proper means to qualify as a trade secret); *Tri-State Floors*, 2022 WL 4653717, at *8 (concluding that evidence of a "unique pricing structure memorialized in detailed spreadsheets" was sufficient for the trade-secret claim to survive summary judgment); *IVS Hydro, Inc. v. Robinson*, 93 F. App'x 521, 528 (4th Cir. 2004) (per curiam) (concluding that the plaintiff's pricing information was not a trade secret because the "approach to pricing was not unique and [the plaintiff] did not expend a great deal of money developing its pricing techniques"); *Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 97 (S.D.N.Y. 2022) ("[W]hile pricing information may constitute a trade secret under certain circumstances, this is generally where a company uses some type of proprietary formula that gives it a unique advantage, such as a complex pricing or trading algorithm in a financial business." (internal quotation marks omitted)). Without more, courts typically treat standard pricing models as insufficient to qualify as trade secrets. *See Fred Hall Shows, Inc. v. Hall*, No.

8:21-CV-00417-JVS-KES, 2021 WL 3473562, at *9 (C.D. Cal. July 28, 2021) (concluding that pricing information did not qualify as a trade secret because the plaintiff failed to allege "anything unique or secret about its pricing structure or its customers' prices").

Double Eagle describes its pricing as "a function of the published surcharge, its machining costs, its material costs (which are highly confidential and fixed) plus customer-specific target margins (which are highly confidential and are based on confidential customer information including ordering history)." Op. Br. at 27 (internal quotation marks omitted). With the right evidence, we believe that Double Eagle's pricing model could qualify as a trade secret. *See, e.g.*, *EIS Ultimate Holding, LP v. Huset*, No. 1:23-CV-02324-GPG-MDB, 2024 WL 4472008, at *14–16 (D. Colo. Sept. 19, 2024) (concluding that project set-up documents with pricing and margin information likely qualify as trade secrets based on testimony that the documents are "the equivalent of an industry-specific software program with extensive formulas and programming throughout the spreadsheets" (cleaned up)); *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1206 (E.D. Cal. 2020) (concluding that the plaintiff was likely to succeed on the merits for the trade-secret claims because the plaintiff "has offered sufficient evidence to show it has spent significant time and resources" developing customer and pricing information such that "the information would give a competitor a substantial business advantage and the information is not readily ascertainable"); *Cool Runnings Int'l Inc. v. Gonzalez*,

24

No. 1:21-CV-00974-DAD-HBK, 2021 WL 5331453, at *7 (E.D. Cal. Nov. 16, 2021) ("Courts in California have routinely found price lists such as the Project Materials Order Form to be trade secrets in that they are used to avoid the labor expended in calculating bids on projects such as the refrigeration projects at issue here.").

But the problem here is that Double Eagle cites meager evidence to support any claims about its pricing model. First, Double Eagle cites a single sentence in an affidavit from its Sales Manager, Steven Lee Stoner. Sealed App. vol. VI, at 1117 ("Double Eagle's pricing is a function of the published surcharge, its machining costs, its material costs (which are highly confidential and fixed) plus customer-specific target margins (which are highly confidential and are based on confidential customer information including ordering history)."). The affidavit does not provide any detail about its pricing model that would allow us to assess the importance of the model, the competitive advantage it offers, the effort required to build the model, or how the cost and pricing data are unique to Double Eagle. *See Tri-State Floors*, 2022 WL 4653717, at *2, *8 (concluding that the plaintiff provided sufficient evidence that its "unique pricing structure" qualified as a trade secret in part because of deposition testimony and an affidavit explaining how the plaintiff's pricing structure "provide[s] a competitive advantage"); *Cool Runnings Int'l Inc.*, 2021 WL 5331453, at *1, *7–8 (finding that the plaintiff was likely to succeed on the merits for its trade-secret claim where the plaintiff presented evidence of the

25

"extensive detail and precision" in the plaintiff's master project materials list, which forms a key component of the plaintiff's "bid matrix algorithms," that the list would allow the defendant to precisely calculate and undercut the plaintiff's future bids, and that the plaintiff "expended significant resources in developing its proprietary information").

Second, Double Eagle cites an affidavit from Crissup that contains the same deficiencies in detail about the pricing model. *See* Sealed App. vol. III, at 522–24. The affidavit references "substantial amounts of historical sales information including bids, price lists, and margins," but it provides no information on the significance of that information in relation to its pricing model. *Id.* at 524. Without more detailed evidence of the pricing model, the generalized information contained in the cited affidavit fails to rise above mere conclusory statements. *See APC Filtration, Inc. v. Becker*, No. 1:07-CV-01462, 2008 WL 3008032, at *9, *11 (N.D. Ill. Aug. 4, 2008) (granting summary judgment to the plaintiff on an Illinois trade-secret claim where the undisputed evidence shows that the plaintiff created price lists by obtaining and developing pricing information for more than twelve years through salespeople, competitors, research, and trade shows and created "deviated" price lists tailored to specific customers based on their needs and relationships with the plaintiff).

Third, Double Eagle cites spreadsheets containing costs for Tulsa Centerless and Carpenter Technologies, as well as the prices for certain parts.

26

Sealed App. vol. III, at 507–14. But again, Double Eagle provides no context for these spreadsheets to allow us to gauge the significance of this information in relation to Double Eagle's pricing. The evidence contains no information about the time, effort, or expense required to create the alleged pricing model, or about the competitive advantage the pricing model offers. Without that context, we also question the confidential nature of these prices given that certain inputs come from Tulsa Centerless and Carpenter Technologies.

Fourth, the most detailed evidence about Double Eagle's pricing model— alerted to us by Defendants—still falls short. The cited evidence consists of deposition testimonies from two Double Eagle employees. Sealed App. vol. I, at 99–102, 113–16. The employees described how they quote prices for requested products, including by looking at the available stock, history of past sales, costs, and market conditions. *Id.* But again, the testimonies provide no information about what sets Double Eagle's pricing model apart from other pricing models. Potential evidence that may have allowed Double Eagle's trade-secret claims to survive in relation to its pricing model includes testimony about the significant pricing history that Double Eagle has compiled compared to its competitors, testimony about a proprietary formula for calculating prices, or testimony about the efficiencies that the pricing model

offers.[14] Though pricing models can qualify as trade secrets, they are not per se trade secrets. And we reject Double Eagle's contention that the mere invocation of "pricing" (or for that matter, "specifications" or "drawings") suffices to identify a trade secret with sufficient particularity at the summary-judgment stage.[15] Without key evidence demonstrating the unique nature of its pricing model, Double Eagle has not proffered sufficient evidence to create a triable issue on whether its pricing qualifies as a trade secret.[16] *See* Fed. R. Civ. P. 56(e)(3).

---

[14] Double Eagle—in an underdeveloped argument—references how its exclusive purchasing agreement with Carpenter Technologies provides a competitive advantage, because Carpenter Technologies is the only domestic mill that procures PSQ material. Though this argument deals with a competitive advantage that Double Eagle has over other distributors, it does not translate into how the pricing model itself confers a competitive advantage. A lower input cost creates a competitive advantage for any business in any industry. That fact is not unique to Double Eagle.

Defendants also appear to operate under the misconception that a "unique" pricing model requires some type of cutting-edge or complex innovation. Not true. Even testimony about the effort expended to compile the pricing data might suffice for showing how the pricing model conferred a competitive advantage. *See Tri-State Floors*, 2022 WL 4653717, at *7.

[15] For example, a gas station that prices its gas by matching the advertised prices of the competitor-gas station across the street does not have a legally protected trade secret.

[16] Double Eagle relies on *Olaplex, Inc. v. L'Oréal USA, Inc.* to argue that courts could "assume" that "business information" and "financials" contained trade-secret information. 855 F. App'x 701, 708 (Fed. Cir. 2021) (internal quotation marks omitted). But Double Eagle misreads *Olaplex*. In *Olaplex*, the Federal Circuit assumed that "business information" and "financials" qualified as trade secrets, because (1) the jury had found that the information contained trade secrets, and (2) the argument on appeal focused on the misappropriation

(*footnote continued*)

### 3.    Customer Drawings

Finally, Double Eagle claims that the customer drawings qualify as trade secrets. But the parties do not dispute that the customer drawings come from the customers, not Double Eagle. And Double Eagle cites no evidence that would allow a reasonable jury to find that Double Eagle owns the drawings despite receiving them from its customers. *See Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 193–94 (1st Cir. 2023) (concluding that the plaintiff provided sufficient evidence of ownership because an agreement stated that any confidential information acquired by the plaintiff's employees is "wholly owned by" the plaintiff). Without more, this fact alone dooms the DTSA claim, which requires that the party filing suit own the trade secret.[17] § 1836(b)(1) ("An *owner* of a trade secret that is misappropriated may bring a civil action . . . . " (emphasis added)); § 1839(4) (defining owner as "the person or entity in

---

prong of the trade-secret claims, not the existence-of-a-trade-secret prong. *Id.* at 703, 708–09. These circumstances distinguish *Olaplex* from this case.

[17] Unlike the DTSA, the OUTSA does not expressly limit trade-secret claims to the owner of the trade secret, nor have Oklahoma courts imputed that requirement onto the statute. *See* Okla. Stat. tit. 78, § 85 et seq.; *MTG Guarnieri Mfg., Inc.*, 239 P.3d at 209 (stating that an OUTSA claim requires showing the existence of a trade secret, misappropriation of the secret by the defendants, and the use of that secret to the plaintiff's detriment); *Gaedeke Holdings VII LTD v. Baker*, 683 F. App'x 677, 683–84 (10th Cir. 2017) (concluding that the OUTSA does not require ownership for a trade-secret claim); *but see Cent. Plastics Co. v. Goodson*, 537 P.2d 330, 333 (Okla. 1975) (stating, in a pre-OUTSA case, that the common-law tort of trade-secret misappropriation requires that the secrets are "the particular secrets of the [plaintiff] as distinguished from the general secrets of the trade").

whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed").

As for the OUTSA claim, Double Eagle fails to present sufficient evidence that these customer drawings were not readily ascertainable. Double Eagle cites no evidence that customers do not share drawings of requested parts with distributors like Double Eagle and Ace Alloys or that it would be difficult to obtain the drawings from customers. App. vol. II, at 286; Sealed App. vol. II, at 333 (example drawing). This lack of evidence prevents us from finding a triable issue on whether the drawings are readily ascertainable by proper means. Okla. Stat. tit. 78, § 86; *MTG Guarnieri Mfg.*, 239 P.3d at 209–10 (citing six factors from the Restatement of Torts, § 757, Comment b (1939), that help determine whether information is a trade secret); *see also* § 1839(3)(B). Therefore, Double Eagle cannot claim the customer drawings as trade secrets under either the DTSA or OUTSA.

Double Eagle argues that customers share drawings with "an understanding that they will be kept confidential." Op. Br. at 8 (citing Sealed App. vol. VII, at 1400). But the only cited evidence that supports this assertion is (1) conclusory testimony from a Double Eagle employee that the customer drawings are "classified" and that "a lot of the drawings have a listing on there not to be shared other than who it's sent to," and (2) customer Alkhorayef Petroleum Company's (APC) confidentiality agreement with Double Eagle. Sealed App. vol. II, at 277; Sealed App. vol. VII, at 1400. That same employee

also testified that customers sent their drawings when they wanted a quote for a particular part. Sealed App. vol. VII, at 1400–01. Indeed, Double Eagle even acknowledges that customers "can share the drawings with anyone they please[.]" Op. Br. at 38. And though Double Eagle signed an agreement that potentially requires keeping APC's drawings confidential, it cites no similar agreement with any other customer. Evidence of restrictions with a single customer does not create a genuine dispute of material fact as to whether the drawings are readily ascertainable through proper means. Even if Double Eagle could not share APC's drawings with a third party, that does not mean the third party could not readily obtain APC's drawings directly from APC or elsewhere. And in fact, the evidence shows that Ace Alloys did obtain APC's drawings elsewhere—from Tulsa Centerless.[18] Sealed App. vol. I, at 159–64; *see also Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*, 584 F.2d 946, 951–52 (10th Cir. 1978) (recognizing that information that "had been published

---

[18] Double Eagle briefly argues that the customer drawings are not readily ascertainable, because Tulsa Centerless improperly provided the drawings to Hooper in violation of its confidentiality obligations to Double Eagle. But as discussed above, Double Eagle's confidentiality agreement with Tulsa Centerless limits Tulsa Centerless from disclosing Double Eagle's proprietary information. Here, the customer drawings come from the customers, not Double Eagle. Double Eagle also puts forth no evidence that Tulsa Centerless received the customer drawings from Double Eagle and not a third party. Though Double Eagle claims that Hooper had sent the drawings to Tulsa Centerless while he worked at Double Eagle, the cited evidence does not support Double Eagle's assertion. *See* Reply Br. at 22 (citing Sealed App. vol. III, at 451, 515). Double Eagle fails to present sufficient evidence that the customer drawings fall within the agreement's purview, leaving us with only Double Eagle's bare assertions that the customer drawings are proprietary.

or otherwise disseminated" could not qualify as trade secrets). Without additional evidence, Double Eagle fails to present a triable issue on whether the customer drawings qualify as trade secrets. *See* Fed. R. Civ. P. 56(e)(3).

For these reasons, the district court properly dismissed the trade-secret claims under the DTSA and OUTSA.[19]

---

[19] Double Eagle attempts to distinguish a party sufficiently identifying a trade secret from the ultimate question of whether such information constitutes a trade secret. Though Double Eagle claims the district court went "beyond" the standard applied by most courts, it cites no authority for this assertion. We see no error in the district court's review, which looked to the sufficiency of the evidence and included no impermissible factfinding. More generally, Double Eagle appears to divorce the identification of a trade secret with sufficient particularity from the sufficiency of the evidence to survive summary judgment. That analytical framework is wrong. At the summary-judgment stage, a plaintiff identifies a trade secret by producing sufficient evidence that could meet the definition of a trade secret under the DTSA and OUTSA. A failure to produce sufficient evidence amounts to a failure to identify a trade secret.

Double Eagle then claims that the district court erred by relying on *Quest Solution, Inc. v. RedLPR, LLC*, because that case dealt with Utah law, not Oklahoma law. No. 2:19-CV-00437-CW-DBP, 2021 WL 1688644, at *1 (D. Utah Apr. 28, 2021). But as discussed, courts often look to other jurisdictions' interpretations of similar statutes for guidance on interpreting a specific state's version of the UTSA. *See, e.g.*, *TLS Mgmt.*, 966 F.3d at 53 (citing Wisconsin law and Illinois law in interpreting Puerto Rico's version of the UTSA). Without a more compelling reason to disregard *Quest Solution*, we see no error in the district court's reliance on this case as persuasive authority.

Double Eagle also attacks the district court's reliance on *Southwest Stainless*, because that case dealt with an appeal of a bench verdict rather than a summary-judgment grant. But the district court never relied on *Southwest Stainless* to weigh the evidence at the summary-judgment stage, as a factfinder would do at trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). At the summary-judgment stage, the question is merely whether the evidence is sufficient for a reasonable jury to find a trade secret. *See id.* ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). And the district

(*footnote continued*)

## II.    Misappropriation Claim

Double Eagle next argues that the district court erred by dismissing the misappropriation claim. Double Eagle contends that (1) a reasonable jury could find that the downloaded files were confidential, and (2) the district court failed to provide Double Eagle with an opportunity to present all evidence in support of this claim. We take each argument in turn.

### A.    The district court properly dismissed the misappropriation claim.

First, Double Eagle asserts that the district court erred by dismissing its claim for misappropriation of confidential business information. The district court granted summary judgment on this claim, because Double Eagle "failed to present evidence concerning the secrecy of the information that Mr. Hooper allegedly misappropriated[.]" *Double Eagle*, 2024 WL 3166921, at *4. On

---

court did not deviate from that standard. *See Double Eagle*, 2024 WL 3166921, at *2–4.

Last, Double Eagle argues that the district court erred by requiring "absolute secrecy" to establish a trade secret. Op. Br. at 29–30. Though Double Eagle correctly characterizes the law, it mischaracterizes the district court's opinion. The district court granted summary judgment on the trade-secret claims because Double Eagle provided no evidence (1) that it prevents customers or suppliers from sharing its prices, (2) that customers do not share drawings with others, and (3) that its margins and specifications were subject to general protections, were known to only a limited number of people, were not readily ascertainable, or were valuable from not being widely known. *Double Eagle*, 2024 WL 3166921, at *2–3. Double Eagle's claims fail for a lack of evidence showing that the information was not readily ascertainable, not because of an "absolute secrecy" requirement.

33

appeal, Double Eagle argues that the district court disregarded evidence of the downloaded files' confidentiality.

Oklahoma recognizes the common-law tort of misappropriation of confidential business information, described as "[o]ne who, for the purpose of advancing a rival business interest, procures by improper means information about another's business[.]" *Am. Biomedical Grp., Inc. v. Techtrol, Inc.*, 374 P.3d 820, 825 (Okla. 2016) (internal quotation marks omitted). The individual "is liable to the other for the harm caused by his possession, disclosure or use of the information." *Id.* (internal quotation marks omitted). As an initial matter, the OUTSA "displace[d] conflicting tort claims only for 'misappropriation of a trade secret.'" *Id.* at 827. But it did not displace tort claims for "misappropriation of business information not rising to the level of a trade secret." *Id.* To qualify as legally protected business information, the plaintiff must present evidence that the misappropriated information was confidential. *Id.* at 826. The information must also "be the particular secrets of the employer as distinguished from the general secrets of the trade in which he is engaged." *Cent. Plastics Co. v. Goodson*, 537 P.2d 330, 333 (Okla. 1975); *see also Am. Biomedical Grp.*, 374 P.3d at 825–86. Information "readily available to competitors" does not amount to confidential business information. *Cent. Plastics*, 537 P.2d at 334.

Though trade secrets differ from confidential information, the lack of secrecy that defeated the trade-secret claims also defeats the misappropriation

34

claim. Double Eagle contends that "at least some of the information" contained in the 2,660 files is confidential.[20] Op. Br. at 43. Again, Double Eagle advances that a large swath of information could qualify as confidential business information without any attempt to identify the allegedly confidential information. We decline to scour the record for "evidence considered material to each legal theory advanced on appeal" or credit the conclusory allegations of confidentiality. *Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022) (internal quotation marks omitted). And as discussed above, Double Eagle's 718 and K500 PSQ specifications are nearly identical to their customers' specifications and to Ace Alloys's specifications. Double Eagle also posted on its website a nearly identical version of its 718

---

[20] We agree with the district court that Double Eagle has "shift[ed] the goalposts" throughout litigation when defining its trade secrets and confidential business information. *Double Eagle*, 2024 WL 3166921, at *1. Double Eagle's president claims that "[a]ll of the Double Eagle information downloaded by Hooper is protected, confidential, and not available to the public or other persons who can obtain economic value from its disclosure or use." Sealed App. vol. III, at 524 (Crissup affidavit). And in the district court, Double Eagle listed its trade secrets as "PSQ specifications, pricing, margins, costs, and customer drawings." *Double Eagle*, 2024 WL 3166921, at *2 (internal quotation marks omitted). On appeal, Double Eagle changes tack and limits the identified trade secrets to just PSQ specifications, pricing, and customer drawings. Double Eagle then represented at oral argument that "most of" the downloaded files qualified as trade secrets without differentiating the trade secrets from the non-trade secrets. Oral Argument at 0:02:39–0:02:46. And that statement seems more expansive than the brief's description "that at least *some* of the information on the . . . [downloaded files] was confidential." Op. Br. at 43 (emphasis added). The varied representations reflect Double Eagle's inability to define its trade secrets or confidential business information with sufficient particularity.

specification. Similarly, the customer drawings are not Double Eagle's "particular secrets," because they come from the customers. *Cent. Plastics*, 537 P.2d at 333. As for Double Eagle's pricing model, the only evidence that Double Eagle cites is an affidavit from its sales manager that its margins and material costs are "highly confidential." Sealed App. vol. VI, at 1117. But that same affidavit shows that other aspects of Double Eagle's pricing are not confidential, such as the published surcharge, machining costs, and the prices themselves. *Id.* Though a pricing model could qualify as confidential business information, Double Eagle presents no evidence that its pricing model is unique to its business, rather than a "general secret[] of the trade." *Cent. Plastics*, 537 P.2d at 333. Without evidence of the time, effort, or expense to create the pricing model, we fail to discern how a pricing model that boils down to margin plus costs differs from any other distributor's pricing scheme.

More generally, Double Eagle also cites an employee handbook, an information-security policy, and other sales department practices to support the confidential nature of the information in the downloaded files. *See* App. vol. I, at 104; App. vol. II, at 292–93; App. vol. III, at 496; Sealed App. vol. III, at 497, 521, 524–25; Sealed App. vol. VI, at 1109, 1154–55, 1162, 1229–30. But again, this evidence suffers the same problem as Double Eagle's other evidence—namely, a lack of detail about how these policies relate to the allegedly confidential business information in the downloaded files. The employee handbook fails to identify the "nonpublic" or "confidential"

information, and no affidavit describes how the sales department practices protect the confidentiality of information in the downloaded files specifically. The information-security policy offers no refuge either. The policy defines confidential information as any information "that is not publicly known," meaning some of Double Eagle's allegedly confidential information contradicts even its internal definition of "confidential information." Sealed App. vol. III, at 501. As the district court accurately described in its opinion, Double Eagle fails to "distinguish the wheat from the chaff," leaving the jury without sufficient evidence to find that any of the downloaded information is confidential under Oklahoma law. *Double Eagle*, 2024 WL 3166921, at *4. For these reasons, the district court properly dismissed the misappropriation claim.[21]

**B.    The district court complied with Rule 56's requirements before granting summary judgment.**

Double Eagle also argues that the district court failed to provide an adequate opportunity for Double Eagle to present all evidence in support of the misappropriation claim. We disagree.

---

[21] We note that the underdeveloped evidence in the record plays a large role in our dismissals of the trade-secret and misappropriation claims. In many instances, Double Eagle makes seemingly plausible and reasonable assertions. And yet the cited portions of the record fail to match the assertion, contain only generalized and conclusory statements, or require one inference too many to adequately support the assertion.

Federal Rule of Civil Procedure 56(f) allows a court to grant summary judgment on grounds not raised by any party after giving notice and a reasonable time to respond. The district court did just that. It provided notice to the parties that it would consider granting summary judgment to Defendants on the misappropriation claim based on (1) whether Double Eagle sufficiently identified the allegedly misappropriated business information, and (2) whether the allegedly misappropriated business information is of a secret or confidential character. App. vol. III, at 549. The district court invited the parties to submit briefs on these issues and properly dismissed the misappropriation claim after considering all submissions.

Double Eagle complains that the district court prohibited Double Eagle from presenting additional evidence to support the misappropriation claim. This argument misstates the record. In the briefing order, the district court instructed the parties to "refer to the exhibits previously submitted in connection with the parties' most recent motions for summary judgment" and to "not introduce new evidence without express leave of [c]ourt." *Id.* at 550. So the district court did not bar Double Eagle from submitting more evidence; it merely required Double Eagle to move for leave of court. Despite receiving notice of the issues and of the district court's preferred procedure, Double Eagle did not request leave to submit new evidence or object to the procedure. By failing to preserve this issue in the district court and failing to argue for plain-error review on

38

appeal, Double Eagle waived this issue.[22] *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).

## III. Civil-Conspiracy Claim

For the last claim, Double Eagle argues that we should reverse the district court's dismissal of the civil-conspiracy claim. Under Oklahoma law, a civil-conspiracy claim requires an underlying tort. *Brock v. Thompson*, 948 P.2d 279, 294 n.66 (Okla. 1997); *see also AKC ex rel. Carroll v. Lawton Indep. Sch. Dist. No. 8*, 9 F. Supp. 3d 1240, 1245 (W.D. Okla. 2014). Because the district court properly dismissed all other claims, we conclude that it properly dismissed the civil-conspiracy claim as well. *Double Eagle*, 2024 WL 3166921, at *5.

## CONCLUSION

For the reasons stated, we affirm.

---

[22] Even if we reached the merits of Double Eagle's argument, we see no error in the district court's procedure. *Kannady v. City of Kiowa*, 590 F.3d 1161, 1170 (10th Cir. 2010) ("A district court may grant summary judgment on a ground not formally raised in a summary judgment motion, so long as the losing party was on notice that she had to come forward with all of her evidence." (cleaned up)).